**LANCASTER et al. v. CARTER et al.**
(No. 407–3761.)

(Commission of Appeals of Texas, Section B.
Nov. 7, 1923.)

**1. Sheriffs and constables ⊛⇒22—Sheriff cannot appoint deputy to guard railroad property except in case of threatened injury.**

A sheriff has no authority to appoint or detail a deputy to guard and watch railroad property, except in specified cases of threatened injury.

**2. Appeal and error ⊛⇒1083(6)—Existence of evidence to support issues held question of law on which decision of Court of Civil Appeals not conclusive.**

Since the question whether there is evidence to support an issue is one of law and not of fact, the decision of the Court of Civil Appeals is subject to review by the Supreme Court in view of Const. art. 5, § 6, and Rev. St. 1911, art. 1590, making judgments of the Court of Civil Appeals conclusive on the facts.

**3. Master and servant ⊛⇒330(3)—Finding of deputy sheriff's agency for railroad sustained.**

In an action against the receivers of a railroad company for the killing of plaintiff's

decedent by a deputy sheriff acting as watchman for the receivers to keep off trespassers, evidence *held* to support a finding that the deputy was acting as the agent of the receivers at the time he fired the shot.

**4. Death ⊛⇒14(2)—Shooting of decedent through mistake by railroad watchman held "recklessness"; "wanton."**

Where plaintiff's decedent, a 16 year old boy employed as a section hand, was shot by a deputy sheriff acting as railroad watchman as he was dismounting from a freight train, the watchman having orders to catch a negro with a pistol, and mistaking decedent for such negro, evidence *held* to sustain a finding that the shooting was wanton or reckless as intentionally shooting in the direction of one with such lack of care as to kill, though not intending to hit him, is extreme recklessness or carelessness, though wanton, and "wanton" did not mean willful.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reckless—Recklessly—Recklessness; Wanton.]

**5. Death ⊛⇒14(1)—Statute confers right to sue receivers.**

Rev. St. 1911, art. 4694, authorizing actions against receivers for injuries resulting in death, gives a right to bring such a suit against receivers of railways in any case in which the same facts would give a right of action against the railroad company.

Error to Court of Civil Appeals of Sixth Supreme Judicial District.

Action by Mrs. H. H. Carter and husband against J. L. Lancaster and another, federal receivers of the Texas & Pacific Railway Company. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (237 S. W. 634), and defendants bring error. Affirmed as recommended by the Commission of Appeals.

Young & Stinchcomb, of Longview, for plaintiffs in error.

Lacy & Bramlette, of Longview, for defendants in error.

HAMILTON, J. Mrs. H. H. Carter, joined pro forma by her husband, sued J. L. Lancaster and Charles L. Wallace, federal receivers of the properties of the Texas & Pacific Railway Company, in the district court of Gregg county, to recover damages for the death of Mrs. Carter's 16 year old son, Haden Cabbiness. Cabbiness and Marcellus Hirth, 19 years old, both of whom had been working as section hands near Wills Point, boarded a freight train at Longview, their home, on the afternoon of August 29, 1920, for Wills Point to go back to work. Before reaching Mineola they decided to stop there for the night. As the train moved slowly through Mineola, they got off, and, as they walked along, they saw two men, and turned in the opposite direction. The men came

on toward the boys, and they began "to trot," and "hurried on." When the boys had gone only a short distance one of these men came running after them, and fired his pistol, striking Cabbiness in the back, and inflicting wounds from which he died. Neither of the boys was armed in any manner.

The man who fired the shot that killed Cabbiness was Joe Phillips, who testified that he was "special agent at Mineola for the receivers of the Texas & Pacific Railway Company on August 29, 1920"; that his duties were "to keep trespassers off of the railway and to look out and see that no one stole any railroad property or freight, and to look out after burglars and robbers"; that his duties "required him to look after trespassers on the trains and property of the receivers at Mineola," "to remove trespassers from said trains and property, and to protect the same from injury and damage"; that he "was deputy sheriff of Wood county, regularly qualified and commissioned"; that he "received no salary from the state of Texas, Wood county, or the city of Mineola"; that he "took said position with the receivers of the Texas & Pacific Railway on August 15, 1918," and "held it continuously since"; that he was "paid $140 per month, and received the same pay in August, 1920"; that his salary was paid to him "by a check executed by the International & Great Northern Railway, and delivered to him by the cashier of said company at Mineola"; that he "was supposed to work at night, and was supposed to work the same way in August, 1920."

W. H. Apel, the sheriff who appointed Phillips deputy sheriff, testified:

"After I appointed him deputy sheriff I did not exercise any control over him. I did not know what he was doing. He did not make any report to me. It was my understanding when I appointed him that he was working for the three railroad companies that enter Mineola, the Texas & Pacific, the International & Great Northern, and the Missouri, Kansas & Texas. I was requested to appoint him by one of the railroad companies mentioned."

[1] That Phillips was the agent for the receivers of the Texas & Pacific Railway Company's properties on August 29, 1920, is conclusively established. The issue was submitted to the jury, and its answer was in the affirmative. Its finding on that issue is thoroughly fortified by the evidence, as shown above. The sheriff had no authority to appoint or detail a deputy to guard and watch the property of the railroad, except in specific cases of threatened injury. T. & N. O. Ry. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857. As held in the case just cited, the fact that Phillips was a deputy sheriff does not prove that his acts were official; neither does the fact that he was likewise a watchman, employed by the railroad company, prove that his acts were those of a servant; that question must be determined by all the circumstances and facts placed in evidence.

While there is no doubt that Phillips was the agent and servant of the receivers on that date, it is strongly insisted by plaintiffs in error that, at the time Phillips fired the shot, he was acting as deputy sheriff, and not as the receivers' agent and servant. Questions Nos. 1, 2, and 3 submitted to the jury by the trial court, and the answers returned thereto by the jury, were respectively:

"Was Joe Phillips on August 29, 1920, acting as agent for the receivers of the Texas & Pacific Railway Company properties?" "Yes."

"If you have answered question No. 1 in the affirmative, then state whether or not the said Joe Phillips, at the time of the act complained of, was acting within the real or apparent scope of his authority as such agent." "Yes."

"At the time of the shooting of Haden Cabbiness, was the said Joe Phillips acting as agent of the receivers of the properties of the Texas & Pacific Railway Company or as deputy sheriff? Say which." "Agent of the receivers of the properties of the Texas & Pacific Railway Company."

[2] The Court of Civil Appeals found there was sufficient evidence to support the jury's answers to all of these questions. The decision of Courts of Civil Appeals "shall be conclusive on all questions of fact brought before them on appeal or error." Const. Tex. art. 5, § 6. "The judgments of the Courts of Civil Appeals shall be conclusive in all cases on the facts of the case." Rev. Civ. St. 1911, art. 1590. But, it is the contention of plaintiffs in error that there is no evidence to support the findings of the jury in answer to questions Nos. 2 and 3 above. Whether there be any evidence or not to support an issue is a question of law, and not of fact. The decision of the Court of Civil Appeals upon this question is subject to review by our Supreme Court. Choate v. S. A. & A. P. Ry. Co., 91 Tex. 406, 44 S. W. 69.

Then, discarding all evidence contrary to the findings of the jury on issues Nos. 2 and 3, was there any evidence to support these findings?

In addition to the testimony quoted above, it was shown by Phillips' testimony that on August 29, about 9:30 p. m., he received a message from Supt. McKay to meet Texas & Pacific train extra 509. The message dated Marshall, August 29, 1920, addressed to Special Agent Phillips, Mineola, and signed by J. McKay, reads as follows:

"Arrange to meet X–509 west at east switch Mineola and take negro off of train who has pistol. Should reach Mineola about 10:45 p. m."

This message was received at Mineola on August 29, 1920, at 9:37 p. m. He further testified:

"I met Texas & Pacific train extra 509, west bound, on August 29, 1920, for the reason that I had a message from Supt. J. McKay, of Marshall, Tex., to meet this train and take a bad negro off of this train that had a pistol."

On direct examination A. K. Puckett, a witness for plaintiffs in error, testified:

"I was around the depot in Mineola, and Joe Phillips spoke to me about a negro that had been shooting up the stations down the road, and said, 'Come and go with me to meet the train.' I said, 'Joe, on what authority are we going down there?' He then showed me a telegram from Mr. McKay to take a negro off the train."

Phillips, after detailing his conduct and that of Cabbiness up to and after the shooting, further testified:

"I ran after him 80 steps. After running him 80 steps he had gained on me, and he had crossed the cattle guard by the side of this train while the train was still running. I then fired my pistol, thinking I might frighten him and he would stop and give up. After the train passed on by, which was running seven or eight miles an hour, Louis Browning and I saw a man down the track. We went to this man, and found the Cabbiness boy down. I flashed my flashlight on him, and I remarked to Louis Browning, 'My God, is this a white man?'"

Marcellus Hirth testified speaking of Phillips as he came up to where Cabbiness lay after he was shot:

"He just said he had a telegram to get a negro. He walked up and said, 'My God, is this a white boy I have shot?'"

Phillips also testified:

"I did not know at whom I was shooting when I fired, but thought I was shooting at the negro."

Phillips also testified:

"I fired the pistol after him with the intention of frightening him, thinking he would stop."

Ex-Sheriff Apel, testified:

"It was my understanding that he gave all his time to the railroad companies at Mineola. He was always on the yard or at the depot. * * * I did not use him."

[3, 4] We think this testimony is evidence that Phillips was acting as the agent of the receivers at the time he fired the shot, and, therefore, is sufficient to sustain the findings of the jury to that effect. The trial court submitted to the jury question No. 4 as follows:

"Was the act of shooting Haden Cabbiness by the said Joe Phillips wanton or reckless on his part?"

To this question the jury answered "Yes." The court did not otherwise submit the issue of recklessness and negligence. The plaintiffs in error contend that the finding of the jury that the shooting was wanton or reckless was no finding that it was careless or negligent. As defined by the Century Dictionary, wanton means: "Characterized by extreme recklessness; foolhardiness, heartlessness, malicious, recklessly disregardful of right or consequence, wild, unruly, loose, unrestrained, playful, sportive, frolicsome." The same authority defines "reck" to mean, "To take heed; have a care, mind, heed, care," and "reckless" as meaning "not recking; careless, heedless, inattentive." The court in his charge defined wanton as follows:

"You are instructed that wanton, or wantonly, means without excuse; that it is a reckless disregard of the rights of others, such a degree of rashness as denotes a total want of care and a willingness to destroy."

He did not define "reckless." No general definition of negligence can be of much value in the practical administration of justice. The reason is that there are so many qualifications to every general statement of legal doctrine that a definition leaves too many things undefined. Negligence may consist either in a wrongful act or a wrongful omission; the omission to do something or the doing of something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do or omit to do under like circumstances. 1 Thomp. Neg. § 1.

"An essential ingredient in any conception of negligence is that it involves the violation of a legal duty which one person owes another—the duty to take care, for the safety of the person or property, of the other; and the converse proposition is that where there is no legal duty to exercise care, there can be no actionable negligence." 1 Thomp. Neg. § 3.

The statute giving the right to bring actions against receivers for injuries resulting in death reads:

"An action for actual damages on account of injuries causing the death of any person may be brought * * * when the death of any person is caused by the negligence or carelessness of the receiver or receivers or other person or persons in charge or control of any railroad, their servants or agents. * * *" Rev. Civ. St. 1911, art. 4694.

[5] We interpret this statute as giving a right to bring such a suit against the receivers of railways in any case in which the same facts would give a right of action against a railroad company.

In the case of Lipscomb v. Railway & Express Co., 95 Tex. 5, 18, 64 S. W. 923, 925 (55 L. R. A. 869, 93 Am. St. Rep. 804), Justice Williams, in discussing the relation of

master and servant under the statute, as it then stood, applicable to suits against railroads for injuries resulting in death, inflicted by their servants, said:

"The statute making such company responsible for the negligence of its servants at once brings into consideration the relation of master and servant and some part, at least, of the common law governing that relation. The master or principal is made responsible for the negligence of the servant or agent—that is, for negligence of the latter happening while they are acting in such capacity. The rule of respondeat superior, to some extent at least, is thus imported by the statute into such cases. As it is established by the better authorities and enforced in this court, that rule does not make the responsibility of the master depend on the question whether an injury inflicted by the servant was willful and intentional or unintentional, but upon the question whether the servant, when he did the wrong, acted in the prosecution of the master's business and within the scope of his authority, or had stepped aside from that business and done an individual wrong. Railway v. Cooper, 88 Texas, 610, and authorities there cited; Haehl v. Wabash, etc., Railway, 119 Mo. 325.'"

Then, after adverting to the fact that there is much authority for the proposition that, under the common law, the master is not liable for the malicious and intentional torts of the servant, even when committed while forwarding the master's business, and after stating that it is by no means clear that the rule of respondeat superior is made to apply in its full force in actions given by the statute, as it then stood, for injuries resulting in death, he said:

"Assuming for the purposes of this case that it does not, and that a killing by a servant which is willful and not negligent is not within the statute, it is still true that, if the killing in question can be regarded as a negligent one, there is a case for the determination of the jury under the statute. The servant acts for the master in executing instructions or rendering service. If he does this without the exercise of due care, he is guilty of negligence. The act which he does may be intentional, but, if it is done without the observance of precautions necessary to a due execution of his instructions or exercise of his authority, this absence of care makes his act a negligent one."

The Court of Civil Appeals (62 S. W. 954) in that case held that the railroad company was not liable for the death of a man who approached the depot and was mistaken for a burglar and shot by the railroad's servants stationed inside the depot to watch for burglars. The Supreme Court held that the act was negligent because it was a careless performance of the duties of the servant, and held that the above-noted holding of the Court of Civil Appeals was erroneous. The court said:

"This view is sustained by both classes of authorities just referred to. McManus v. Crickett, 1 East, 67; Croft v. Alison, 4 Barn. & Ald. 590. In the latter case, the doctrine is thus stated: 'If a servant driving a carriage, in order to effect some purpose of his own, wantonly strike the horses of another person and produce the accident, the master will not be liable. But if, in order to perform his master's orders, he strikes but injudiciously and in order to extricate himself from a difficulty, that will be negligent and careless conduct for which the master will be liable, being an act done in pursuance of the servant's employment.' In that case, the act of the servant in striking the horses was intentional, but as it was 'injudiciously' done, it was held that it was also a negligent performance of his duty as servant. It seems to us that this brings the case of a shooting by a servant, which was intentionally done because of mistake resulting from want of proper care in carrying out the master's orders, within the word 'negligence' used in the statute. The act is negligent because it is a careless performance of the duty of the servant. We are therefore of the opinion that the Court of Civil Appeals took an erroneous view of this question."

So in the case at bar Phillips was instructed to "catch a negro with a pistol." This itself involved the exercise of discretion necessary in distinguishing "a negro with a pistol" from a white boy without a pistol, and in catching him and determining the degree of care called for by the circumstances. The finding of the jury is not that the killing was wanton. Its finding was that the act of shooting was wanton. The only testimony as to the purpose of the shooting was given by Phillips. He testified that he shot to stop Cabbiness. He did not intend to hit him, according to his testimony. Intentionally shooting in the direction of one with such lack of care as to inflict a fatal stroke of the bullet, though not intending to hit the person, is extreme recklessness or carelessness, is recklessly disregardful of right or consequence, and is wanton, but nevertheless is a negligent act. In I. & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902, it is said

"To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must in general depend upon the nature of the service he is engaged to perform and the circumstances of the particular case."

Here Phillips had general authority to watch and guard the railroad company's properties and remove trespassers from its trains and property, and had special instructions to catch a negro and his act in firing the shot to stop him was in the very execution of the special instruction given him by the message he received from Supt. McKay. He was trying to catch a negro. He chased Cabbiness. Cabbiness was gaining on him. He fired to stop him, but struck him in the back.

In I. & G. N. Ry. Co. v. Cooper, 88 Tex. 610, 32 S. W. 517, a suit for damages arising, while the railroad company was in the hands of a receiver, from the engineer and fireman's act in inserting the nozzle of a hose connected with the boiler in the hip pocket of plaintiff, who was not a passenger, but riding on the tender of the train, and turning upon him hot water or steam which scalded and injured him, Justice Brown said:

"The distinction lies in this, that if the act done, that is, the discharge of the hot water, was one authorized to be done by the servants, and was at the time being done in the discharge of their duty as such servants, then the master would be responsible for the consequences to the plaintiff, although the servants might, in the discharge of their duty, maliciously or mischievously have thrown the water upon the plaintiff. * * * It does not matter that the servant might have used the same appliances in the discharge of a duty to the master, but the question definitely and distinctly presented is, Was the servant in the particular case in the discharge of such duty? And as before said, if thus in discharge of a duty, the manner of its performance, if wrongful, whether that be negligently done, maliciously or in sport, does not affect the question of liability."

The servant in this case was actually in the discharge of his duty at the time he fired the shot. We think clearly so. If not absolutely so, then, we think the evidence hereinbefore quoted is sufficient, without question, to sustain the findings of the jury and Court of Civil Appeals to that effect.

In T. & N. O. Ry. Co. v. Parsons, supra, a suit for damages for death inflicted by one Futch, a deputy sheriff, employed by the T. & N. O. Ry. Co. to watch and guard its property, Futch was removing from the property several men whom he found in a box car. While going down the track a man approached Futch and asked him for a match. Futch, believing him to be a member of the squad whom he was marching off the property, ordered him to take his place amongst them, and not to approach him. The man advanced toward Futch, whereupon Futch fired and killed him. In this case Justice Brown said:

"We think the evidence in this case shows that at the time Futch marched the men, including the plaintiff, down the railroad track to put them off the company's property, he was acting in the capacity of watchman and agent of the company, and if he fired the shot which caused the injury while in the performance of or in furtherance of that duty then the railroad company must be held liable for the consequences."

The court held defendant liable.

As we interpret the authorities, they hold that, when the act is committed in the discharge of the servant's duties, if it is wrongful and to the injury of another, the master is liable, regardless of the mental status of the servant at the time he committed the act. The jury found that Phillips shot while in the discharge of his duty as servant. The Court of Civil Appeals so finds, and we think the evidence supports the finding. Aside from this, we think the word "wanton" in the special issue submitted does not mean willful. In the case of Lafayette & Indianapolis Ry. Co. v. Huffman, 28 Ind. 290, 92 Am. Dec. 318, the court said:

"The word 'wanton' does not mean willful. It is defined by Webster as follows: 'Wandering or roving in gayety or sport'; 'licentious'; 'lewd'; 'extravagant,' &c. The word adds no force to the charge that the act was done in a careless manner."

So, here the word "wanton" adds no force to the special issue asking whether the act was reckless, which means careless. The answer was a finding that the act of Phillips in shooting deceased was reckless. This means that the act was careless. Regardless of what the word means, an eminent authority, speaking of negligence, says:

"It is often said that negligence is a violation, through *heedlessness* or *inattention*, of some legal duty which one person owes to another. But it is plain that the rule equally applies, and even more strongly, where the duty of taking care, which the law raises in a given situation, or under a given contract, is violated through *recklessness*, *wantonness*, or a *positive intention* to do harm, than where it is violated through mere heedlessness, carelessness or inattention." 1 Thomp. Neg. § 7. (Emphasis ours.)

We have considered all other assignments, and they are overruled.

We recommend that the judgment of the District Court and Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.