**HUDSON et al. v. ST. LOUIS SOUTHWEST-
ERN RY. CO. OF TEXAS.***
(No. 757–4718.)

Commission of Appeals of Texas, Section B.
April 27, 1927.

1. **Master and servant ⬤➝301 (3)—Peace officer
may become private employee, and test of tort
liability is capacity in which he acts at time.**

Public peace officer may become private em-
ployee to protect property of another, and test
of liability for tort committed by such officer
is capacity in which he acted at time of tortious
act.

2. **Master and servant ⬤➝301 (3)—Official ca-
pacity of peace officer, privately employed,
affords no protection to employer for acts
done within scope of employment.**

Official capacity of peace officer employed
by individual or private corporation affords no
protection to employer for tortious acts done by
the officer in course and within scope of such
employment.

3. **Railroads ⬤➝281 (1)—"Open Port Law" has
no bearing on railroad's liability for homi-
cide by state ranger acting as guard dur-
ing strike (Acts 4th Called Sess. 36th Leg.
[1920] c. 5).**

Acts 4th Called Sess. 36th Leg. (1920) c. 5,
known as "Open Port Law," has no bearing on
liability of railroad for homicide by state ranger
furnished as guard during strike; such liability
depending on whether he was employee of com-
pany acting within scope of employment.

4. **Sheriffs and constables ⬤➝86—Public peace
officers step aside from official duties when
guarding private property, but such acts are
not unlawful.**

Duties of public peace officers pertain to
public, and not to guarding private property,
and when such officer guards private property
he has stepped aside from his official duties,
though it is not unlawful for him to do so.

5. **Evidence ⬤➝14—Courts judicially notice that
in case of strikes by railroad employees there
is industrial warfare; weapons being lack
of employment and picket.**

It is matter of judicial notice that in cases of
serious strikes by employees of railway compa-
nies there does arise a species of industrial
warfare; principal weapon on one side being
lack of employment and on other side the picket.

6. **States ⬤➝68—Maintaining of picket line dur-
ing strike being lawful, there was no occasion
for state ranger acting as guard to interfere.**

Maintaining of picket line during strike be-
ing lawful, there was no occasion for official act
against pickets by state ranger acting as guard.

7. **Railroads ⬤➝281(1)—Railroad may employ
guards to protect property against picket line
of striking employees.**

Railroad company has right to employ
guards and place them about its property in or-
der to afford protection against picket line main-
tained by striking employees.

8. **Master and servant ⬤➝302(2)—Master is
liable for servant's wrongful act within scope
of employment, though unauthorized act, or
forbidden.**

Master is not excused from liability for
acts of servant by fact that servant had no au-
thority to do particular act, or that he was ex-
pressly forbidden to do it; master being liable
for all wrongful acts within scope of employ-
ment.

9. **Railroads ⬤➝281(1)—Railroad held liable for
shooting of picket by state ranger hired during
strike, though he violated instructions; "scope
of employment."**

Where railroad company had hired state
rangers to guard its property during strike,
shooting of picket by ranger held within scope of
ranger's employment, and company was not re-
lieved because he exceeded authority or violated
instructions.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Scope of
Employment.]

10. **Railroads ⬤➝281(1)—State ranger selected
by state officer to guard railroad's property
during strike held "servant" of railroad.**

Relation of master and "servant" held to
exist between railroad company and state
ranger who was paid by company to protect its
property during strike, though rangers were se-
lected by a state officer designated by Governor;
it appearing that company could discharge
rangers from its employ.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Servant.]

11. **Appeal and error ⬤➝1094(5)—Court of
Civil Appeals may set aside judgment on dis-
approval of verdict, and on review such action
may not be revised.**

Court of Civil Appeals may set aside judg-
ment on its disapproval of verdict on any of
material issues, and there is no authority on re-
view to revise that action.

12. **Appeal and error ⬤➝1175(5)—Court of
Civil Appeals cannot render judgment on
findings contrary to verdict it disapproves, but
must remand for another trial.**

Though Court of Civil Appeals may set aside
judgment on disapproval of verdict, it may not
render different judgment based on contrary
findings, but must remand cause for another
trial.

13. **Trial ⬤➝141, 142—Court may take fact
question from jury only when evidence is un-
disputed or reasonable minds could not differ
on conclusions to be drawn therefrom.**

Court can take away fact question from
jury only when evidence is undisputed or is such
that reasonable minds could not differ in con-
clusions to be drawn therefrom.

Error to Court of Civil Appeals of Sixth
Supreme Judicial District.

Suit by W. H. Hudson and another against
the St. Louis Southwestern Railway Compa-
ny of Texas. From a judgment of the Court
of Civil Appeals (286 S. W. 766), reversing a

---

⬤➝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Rehearing denied 295 S. W. —.

judgment for plaintiffs, they bring error. Affirmed in part, and reversed in part, and remanded.

Cone Johnson and Edwards & Hughes, all of Tyler, for plaintiffs in error.

E. B. Perkins, of Dallas, and Marsh & McIlwaine, of Tyler, for defendant in error.

SPEER, J. The following statement of the case is taken from the opinion by the Court of Civil Appeals through Justice Hodges, reported in 286 S. W. 766:

"In July, 1922, there occurred what is commonly known as the railway shopmen's strike. At that time the appellant owned, at Tyler, Tex., repair shops in which several hundred men had been employed. A large number of those employees joined the strikers and quit work. Upon the ground that it was apprehensive of violence to its remaining employees and interference with its railway operations by the strikers and their sympathizers, appellant, through its attorneys, applied to the Governor of Texas for a body of rangers to act as a guard for its property and employees. The Governor consented to send rangers, provided the appellant would furnish the funds with which to pay their compensation, giving as a reason that no appropriation was available for that purpose. This was agreed to by the appellant's representatives, and, under orders from the Governor and the adjutant general, a number of rangers were assembled at Tyler, under the command of Capt. H. P. Brady.

"On or about October 7, L. W. Pearce, one of those holding a commission as a ranger, shot and killed Clayton Hudson, a son of the appellees W. H. and Rosa Hudson. The circumstances showed that the killing was without any justification. Some time later this suit was filed by the appellees against the appellant to recover damages resulting from the wrongful killing of their son by Pearce. It was alleged, among other things, that Pearce, while nominally a state ranger, was in fact an employee of the appellant; that he had been selected and armed at the instance of the appellant, was paid for his services by appellant, and was when the killing occurred acting in furtherance of his employment. It was also alleged that Pearce was a violent and dangerous man, unfit for such duties, and that, notwithstanding this was known to the appellant, Pearce was continued in its service.

"As a defense the appellant pleaded specially the existence of the strike and its attending disturbances; that for the purpose of protecting its local property from injury and its employees remaining in the service from violent molestation, in order that it might continue its operations as a common carrier, it applied for and secured in a lawful manner a number of state rangers to act as guards to prevent threatened violence. It further alleged that Pearce was one of those legally appointed rangers; that he was subject only to the orders and authority of the regularly appointed captain of the ranger force, and was in no sense its private employee, nor was he at the time of the killing performing any service for the railway company. It also averred that the killing of Hudson by Pearce was the result of a private difference between Pearce and Hudson, wholly unconnected with any legal duty which Pearce had engaged to perform for appellant.

"The court submitted to the jury the following special issues: (1) Was Pearce an employee of the defendant company on the occasion and at the time Hudson was killed? (2) Was he at that time acting within the scope of his employment? (3) Was the killing of Hudson by Pearce a wrongful act? (4) Was Pearce a person unfit for the service, if any, he was employed by the defendant to perform? (5) Could the defendant or its officers by the exercise of ordinary care have ascertained before the killing of Hudson that Pearce was a person unfit (if he was unfit) for the service, if any, in which he was employed by the defendant company at the time of the killing? (6) Was such unfitness, if any, a proximate cause of the death of Hudson? (7) Was the appellant, its agents and servants, guilty of negligence in permitting Pearce to be and remain in the service, if he was, at the time of the killing? (8) Was such negligence of defendant, if there was any, a proximate cause of the death of Hudson? All of those questions were answered in the affirmative. In answer to other questions the jury fixed the aggregate damages to the appellees at the sum of $9,500."

The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for the railway company. It is not quite clear whether the Court of Civil Appeals meant to hold that Pearce must be treated as a public officer at the time he killed young Hudson, or merely that he was not the employee and servant of the railway company, for in the course of the opinion it is stated:

"The circumstances under which the killing occurred show that Pearce was not then acting in his official capacity, Hudson had not committed any offense against the laws of the state, and Pearce was not attempting to make an arrest. The assault was apparently unprovoked, and prompted solely by some motive personal to Pearce. The official position of Pearce would therefore furnish no legal justification for the act."

But further on it is said:

"We therefore conclude that under the evidence Pearce must be treated as a public officer, and not as the servant of the appellant."

We interpret the holding to be, however, that the findings of the jury that Pearce was an employee of the company, and that at the time of the killing he was acting within the scope of his employment, were not supported by the evidence, and not to be that the undisputed evidence showed that Pearce was acting in an official way at the time of the killing. This latter question seems not to have been submitted to the jury.

[1-3] It seems to be well settled that a public peace officer may become the private employee of another for the purpose of guarding and protecting such other's property, and

the test of liability for a tort committed by such officer or employee seems to be in what *capacity he was acting at the time the act was done.* One may be both a public peace officer and a private employee as watchman for an individual or corporation, at the same time, and it does not of course follow that the official character of the individual would be any protection to an action against the employer for his acts done in the course and within the scope of the employment. The question is, "Whose servant was he?" And, further, "Was the act complained of committed while he was acting within the scope of his employment, if a servant of another?" Such is the holding of our Supreme Court in Texas, etc., Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857; Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392; Rucker v. Barker, 108 Tex. 280, 192 S. W. 528. Indeed, the opinion of the Court of Civil Appeals in this case recognizes this rule, and enters into a discussion and decision of whether or not the service which Pearce and the other special rangers were performing was official or unofficial. In the course of the opinion Justice Hodges very pointedly says:

"A public officer may, for certain purposes, be the servant of a private corporation; and when such the official character of the servant furnishes no protection to his employer against the consequences of unofficial acts done in the line of employment."

So that the question of whether or not Pearce's being a state ranger would constitute any defense to this action passes out of the case. The material inquiry is whether or not at the time of the killing he was an employee of the company acting within the scope of such employment. Whether or not he was at the same time a peace officer is of little or no practical value in determining this issue. It may easily becloud the issue. Moreover, Acts 4th Called Sess., 36th Leg. (1920) c. 5, known as the "Open Port Law," has little or no bearing upon the question.

[4-8] Now, public peace officers are not concerned with the guarding of private property. Their duties pertain primarily to the public—the arresting of offenders and the suppression and prevention of crime, in a measure. The guarding of private property is not the function of a public official, and, when he is thus engaged, he has stepped aside from his official duties. Such seems to be lawful, but the wisdom of it is extremely questionable. It is matter of judicial notice in the courts that in cases of serious strikes by employees of railway companies there does arise a species of industrial warfare in which the principal weapon upon the one hand is the embarrassment of lack of employment even at times to the point of want and hunger, and, on the other, that universal aid to the strike—the picket. The weapons are not always of equal potency, but the respective methods are within themselves at least not unlawful. The fact remains, however, in all such cases, and in the present case, the success of the picket line is a telling factor in this industrial battle. It cannot be doubted, therefore, in the very nature of things, that a part of the duties—yea, much of them—of these ranger guards had to do with this picket line. Indeed, there is much evidence tending to show this to be the case. The maintaining of such picket line and performing services thereon being altogether lawful, there was nothing calling for the exercise by Pearce of any official act toward young Hudson. He had violated no law and was not threatening any violation. His services on picket duty for the strikers could only serve as an embarrassment to the company and contribute in some measure to its difficulties in efficiently carrying on its business. For this reason, it was highly important to the company that its shops should be protected against the picket in so far as was lawful and proper, and to that end it had a right, as it did, to employ and place guards about its property. There can be no doubt but that the duty of Pearce and the other guards about the premises would necessitate the ejectment of trespassers, and especially strikers, whose presence was calculated to interfere with the progress of the company's work. That would be the plain duty of such guards. But the contention is that, since Hudson was not trespassing nor threatening a trespass, and was not *violating any law of the state, nor threatening any,* the act of Pearce in shooting him was not only unjustifiable, but was not within the service for which he was employed; that he had turned aside from such service and engaged in an altercation purely personal and foreign to the service, for which his employer would not be liable. But we cannot sustain this contention. It is not sufficient to excuse the employer that the employee had no authority to commit the particular wrong complained of, or even that he had been expressly forbidden to do it. The test is not whether he was employed to do that particular thing, but rather whether, in doing it, he was acting within the scope of his employment. Of course, an employer never employs a servant to be negligent or to commit an injury to any one in the course of his employment. Nevertheless, he is liable in those cases where such negligence or other wrongful act occurs within the scope of the employment. In Burnett v. Oechsner, 92 Tex. 588, 50 S. W. 562, 71 Am. St. Rep. 880, the following is quoted with approval:

"To hold the master liable for the act of his servant, it is not necessary that the servant should have the authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be

liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful and to the injury of another, the master is liable, although he may have expressly forbidden the particular act."

See, also, Reid Auto Co. v. Gorsczya (Tex. Civ. App.) 144 S. W. 688; Rucker v. Barker, 108 Tex. 280, 192 S. W. 528; International & G. N. R. Co. v. Cooper, 88 Tex. 607, 32 S. W. 517; Lipscomb v. Houston & T. C. R. Co., 95 Tex. 5, 64 S. W. 923, 55 L. R. A. 869, 93 Am. St. Rep. 804; Chicago, R. I. & G. R. Co. v. Carter (Tex. Com. App.) 261 S. W. 135; Lancaster v. Campbell (Tex. Civ. App.) 218 S. W. 550; International & G. N. R. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392.

[9] It cannot be doubted that, as to Pearce's acts in dealing with the picket line and in his altercation with the deceased, he was engaged in a work which could be in furtherance of his employer's service, and the employer is not relieved because he exceeded his authority in the details of the performance, or even violated, as has been shown, express instructions, or that in committing the act he lost his temper, got mad, or the like. See Texas & P. R. Co. v. Lyons (Tex. Civ. App.) 50 S. W. 161; Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392; Texas & N. O. R. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857; Texas & P. R. Co. v. Wiley (Tex. Civ. App.) 155 S. W. 356; Panhandle & S. F. R. Co. v. Daldorf (Tex. Civ. App.) 266 S. W. 208; Rucker v. Barker, 108 Tex. 280, 192 S. W. 528.

Numerous outside cases could be cited to the above propositions, but it is unnecessary. They are abundantly supported by our own decisions.

[10] Defendant in error suggests that the relation of master and servant could not exist between it and Pearce, because one of the essential elements incident to that relation, it contends, is wanting; that is, the power to discharge. It is pointed out the company did not employ Pearce, but rather it applied to the Governor for rangers for protection, and that the Governor designated Capt. Brady, who collected the necessary rangers for service. It is, of course, true the company could not discharge Pearce in his official capacity. It had nothing to do with him in that capacity, but it is equally true that it could discharge him, and the squad of rangers as to that, in so far as they were employees, with or without notice. They admittedly entered upon their duties under a contract by which the company undertook to pay their wages, and there is no reason why the company could not terminate that service at its pleasure. Moreover, it is not true in any just sense that Pearce was not employed by the company. The fact that he was selected by Capt. Brady does not alter the fact that at last he was employed by defendant in error. The state officers in this case were the mere agency through which defendant in error selected its employees.

[11-13] The Court of Civil Appeals reversed the judgment based upon the verdict heretofore set out, and entered judgment for the appellant. It was within the province of that court to set aside the judgment upon its disapproval of the verdict upon any of the material issues, as it did; but it was not within its power to render a different judgment upon contrary findings. If the honorable Court of Civil Appeals had rendered judgment upon its conclusion that Pearce at the time of the killing was acting in his official capacity as a peace officer of the state, we might then have a question of law, but it has not done this. It has set aside the findings upon the special issues as to whether Pearce was an employee of the defendant company, and whether, at the time, he was acting within the scope of his employment. Upon these issues there was evidence both ways. It would not be proper for us to discuss further than necessary what this testimony was, but there is an abundance of evidence in the record which would justify a jury or court in finding both of these issues, as the jury did find them, but, as there was some evidence to the contrary, it was within the province of the Court of Civil Appeals to set aside the findings, and we have no authority to revise that action, but, having done so, it was its duty to remand the cause for another trial. Taber v. Dallas County, 101 Tex. 241, 106 S. W. 332. The court can take away a fact question from the jury only when the evidence is undisputed or is such that reasonable minds could not differ in the conclusions to be drawn therefrom.

Of course, what we have said in this opinion with respect to the issues of employment and scope of employment is not intended as expressing any views as to the weight of the testimony, but rather to indicate that the testimony was such as to authorize a jury or court in its discretion to find as we have indicated.

For the error of the Court of Civil Appeals in rendering judgment for appellant in that court, the judgment of that court should be reversed, so far as it rendered judgment, and in so far as it reversed the trial court for the insufficiency of evidence to support the judgment, its judgment should be affirmed, and it is so recommended.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, in so far as it rendered judgment for defendant in error; judgment of the Court of Civil Appeals affirm-

ed, in so far as it reversed judgment of district court, and cause is remanded to the district court for new trial, as recommended by the Commission of Appeals.