GULF, C. & S. F. RY. CO. v. COBB.
No. 7665.

Court of Civil Appeals of Texas. Austin.
Dec. 2, 1931.

Rehearing Denied Dec. 23, 1931.

Terry, Cavin, & Mills, of Galveston, Jno. B. Daniel, of Temple, and Lee, Lomax & Wren, of Fort Worth, for appellant.

Winbourn Pearce, and Walker Saulsbury, both of Temple, for appellee.

BLAIR, J.

Appellee sued appellant for damages for personal injuries resulting from an assault made upon him by an employee of appellant shooting him with a pistol. A jury trial resulted in judgment in favor of appellee for $26,196; hence this appeal.

Appellee alleged that he was employed as trainmaster of Dodson Shows, and was directing the switching and placing of its cars for loading, in appellant's switchyard at Temple, Tex., when J. L. Durden, an employee of appellant, while engaged in the discharge of his duties as engine foreman or

**324**

switchman for appellant, and while acting for and on behalf of appellant, and within the scope of his authority or employment, and while in and about and undertaking to do his work for appellant in connection with the switching and placing of the cars of Dodson Shows, made an assault upon appellee by shooting him in three places in the back with a pistol, inflicting the injuries alleged. Appellant answered that, if Durden made the assault, he was not acting within the scope of his authority or employment as switchman for appellant, but that the assault was Durden's individual and independent action, and not connected with his duties as employee of appellant; and that the assault was not committed at the direction or sanction of appellant. Further answering upon information and belief, appellant alleged that Durden acted in his own necessary self-defense in committing the assault.

Special issue No. 1, the jury's answer thereto, and the instructions in connection therewith, are as follows:

"Do you find from a preponderance of the evidence that the shooting of plaintiff Wallace A. Cobb by John Durden immediately grew out of the performance by said Durden of his duties as an employee of the defendant, Gulf, Colorado & Santa Fé Railway Company? Answer 'yes' or 'no.'" Answer: "Yes."

"In connection with special issue No. 1 you are instructed that the phrase 'immediately grew out of the performance by said Durden of his duties as an employee of the defendant,' means an act done in doing that which he was employed by the defendant Railway Company to do."

In answer to special issue No. 2, the jury found that Durden did not shoot appellee in self-defense.

By its propositions 1 to 5, both inclusive, appellant contends that the jury's answer to special issue No. 1 has no legal evidence to support it, in that the undisputed evidence showed that at the time of the shooting Durden was not acting within the scope of his authority or employment; and that the shooting was not done in the furtherance of appellant's business, or in the accomplishment of the object for which Durden was employed; but that under the undisputed evidence the shooting was the result of resentment of an insult or the result of personal animosities of Durden. We do not sustain these contentions.

In substance, the evidence showed that appellee was employed as trainmaster for Dodson Shows, and was engaged at the time of the shooting in directing the switching and placing of the show cars for loading in appellant's switchyard at Temple, Tex. J. L. Durden was also there, employed as engine foreman or switchman for appellant, and was engaged in managing and controlling the switching and placing of the show cars. Appellee had the right to direct the manner of switching and placing the show cars when such directions were consistent with the rules of appellant controlling Durden. Appellee and Durden met for the first time on Monday preceding the shooting on Saturday, when they were engaged in switching and placing the show cars for unloading at Temple. These switching operations by Durden did not meet with the entire approval of appellee, but ended with some criticism and emphatic words by appellee to Durden. On the following Thursday, appellee and Durden met on the platform of one of the show cars, which was being switched, and rode together for some distance without referring to the unpleasantness between them on the previous Monday. On the following Saturday, appellee was again in appellant's switchyard for the purpose of directing the switching and placing of the show cars for loading. He requested Mr. Stalkup, appellant's yardmaster, and Durden to switch and place the show cars in a certain manner, and Durden had partially completed the switching operations as directed, when he signaled the engine to pull away and began the switching contrary to the directions of appellee. Both Stalkup and appellee signaled Durden to stop and come back, but he refused to do so. Appellee and Stalkup then started to Durden for the purpose of asking him to do the switching as directed. Stalkup stopped about one hundred feet before reaching Durden, but appellee proceeded to within about ten feet of Durden, when he gave a violent signal directing the movements of the train, which signal was not obeyed, because Durden alone could direct the movements of the train under appellant's rules. As appellee gave the signal, he asked Durden, "why he wanted to be so damn bullheaded and couldn't do as we asked him?" Durden replied, "Don't fool with me," and continued in the actual control and management of the switching operations. Appellee replied that he "wouldn't have to fool with" him, and as he made this reply turned to go and request Stalkup, who was superior in authority, to have the switching done as he had requested. Appellee and Taylor, another switchman of appellant helping in the switching of the show cars, testified that after appellee had taken a few steps toward Stalkup, Durden shot him in the back with a pistol; once while he was walking away, and twice after he had fallen. Durden testified that he shot appellee "just as he wheeled" to go, and "when he whirled and then it was that I shot." Durden testified that he shot appellee because he made a movement toward his bosom, with his hand, as if he was going to get a gun; and also shot him because witness thought after appellee turned to go he was going to get around the end of

the car and take some advantage of witness. There was evidence of communicated threats made by appellee toward Durden, and Durden gave his reason for shooting appellee, as follows: "I was not using the gun on that occasion in connection with my employment as a switchman for the Santa Fé Railroad. I stepped aside from my employment as a switchman and handled my own personal matter at that time. The fact of my carrying a pistol and using it at that time was simply a culmination of the trouble that started on Monday. At the time I had the pistol there that Saturday afternoon and used it, I had in mind the threats that had been made to me and communicated to me. I was in fear of my life at that time from that man. He was the meanest looking man I ever saw in my life. When he came to me and made that remark about me being a bullheaded bastard he did not say it with a smile like he was joking. He said it in a mean way."

Durden testified that he "had charge of the movements of the engine in the switching of cars and around over the yard"; and also testified with reference to appellee's giving some signals while witness was doing this "switching and pushing in some of the cars," as follows:

"After that I saw Mr. Cobb (appellee) giving this violent signal still coming towards me."

"He came to me on this occasion, and the first I noticed he gave a signal just before I shot him. He was walking towards me right fast the first I noticed, right at that particular time. The first I noticed he was walking towards me giving me a signal."

"Before that time on a good many occasions I had handled circus equipment at Temple. I never saw the trainmaster, the man who tells the railroad as to where he wants the cars to be put, etc., get out there and attempt to give the train crew signals; I never saw it done before in my life. From the standpoint of railroad operation, outsiders are not to give signals because we are responsible for the cars we are handling and we have got to see that everything is in the clear. They hold us responsible for the cars I am handling and if we take somebody else's signals and they are killed, it would be too bad for me."

With reference to their differences on Monday preceding the shooting on Saturday, Durden testified, as follows: "I could not keep him (appellee) from giving signals. * * * Mr. Cobb proceeded to the north end of the string of empty flats on Main Street and gave a signal for the crew, or rather to the switchman in charge (Durden) to get on with the empty cars. That was positively against the rules. We cannot afford it."

There was no evidence, except possibly circumstantial, that the assault was the result

of insults or pers  |nimosities of Durden. He was appellant's  tness, and testified as follows: "I pulled the gun and shot him. I don't know how many times I shot. I pulled the gun because I was afraid he was going to shoot me. * * * At the time I had the pistol there that Saturday afternoon and used it, I had in mind the threats that had been made to me and communicated to me."

He further testified: "I did not shoot him because he had cursed me. I shot him because I thought he was going to get me. I shot him because I thought he was going to get behind the train and shoot me from the train."

In various statements throughout his testimony, Durden claimed that he shot appellee because he was afraid appellee was going to shoot or kill him, or do him some serious bodily harm, but positively denied that he did the shooting as the result of an insult, or personal animosity, or bad feeling.

In practically all jurisdictions, the law is now settled that a master is liable for the willful and malicious acts of his servant when done within the scope of his employment. Such acts are imputable to the master under the doctrine of respondeat superior, and in accordance with the general principles that the master is liable for any act of the servant done within the scope of his employment, as well as for any act of the servant which, if isolated would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as being one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act. 39 C. J. 1293; Vol. 6 Labatt's Master & Servant, 6717, 7089–91, 6878, where it is said that "the wilful quality of the tort is an element of slight and constantly diminishing importance" with respect to the liability of the master. If under these general principles the facts show the act of the servant to be within the scope of his employment, the master is liable therefor, although the act was in disobedience of and contrary to the order or instruction of the master, and not directed or sanctioned by the master, and in excess of the servant's authority, and without regard to the motive or intent of the servant for doing the act. International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; Galveston, H. & S. A. Ry. Co. v. Zantzinger, 93 Tex. 64, 53 S. W. 379, 47 L. R. A. 282, 77 Am. St. Rep. 829; Hudson v. Ry. Co. (Tex. Com. App.) 293 S. W. 811; Home Tel. & Electric Co. v. Branton (Tex. Civ. App.) 7 S.W.(2d) 627; Houston & T. C. Ry. Co. v. Bulger, 35 Tex. Civ. App. 478, 80 S. W. 557; Schmidt v. Vanderveer, 110 App. Div. 758, 97 N. Y. S. 441; Burns v. R. Co., 4 App. Div. 426; 38 N. Y. S. 856; Vol. 6

Labatt's Master & Servant, 6905–6908; 39 C. J. 1293.

◼ However, the motive and intent of the servant for doing an illegal or wrongful act may be considered, in case of doubt, in determining whether the act is within the scope of the servant's employment; and of course the master will not be held responsible if it appears that the act which occasioned the injury was done by the servant solely because of resentment of an insult or bad feeling, and not done in the doing of that which the servant was employed to do. Home Tel. & Electric Co. v. Branton (Tex. Civ. App.) 7 S.W.(2d) 627; 39 C. J. 1293; Vol. 6 Labatt's Master & Servant, 6905.

In the application of the above general principles of law, our courts have held the tort of the servant to be within the scope of his employment with respect to the incidents of time, place, and quality, and properly imputable to the master under certain groups of facts similar to the facts in the instant case, as follows:

First. When the master places his property in the possession of his servant, "the right to protect that possession, as well as the right to prevent any interference with its immediate use, springs out of the possession and the duty to control and manage it," and, for any assault made by the servant upon a third person immediately growing out of the exercise of his right to control and manage the property by which the servant uses more force than is necessary, the master is liable for the injuries so inflicted. Galveston, H. & S. A. Ry. Co. v. Zantzinger, 93 Tex. 64, 53 S. W. 379, 47 L. R. A. 282, 77 Am. St. Rep. 829; Houston & T. C. Ry. Co. v. Bell, 97 Tex. 71, 75 S. W. 484; Houston & T. C. Ry. Co. v. Bulger, 35 Tex. Civ. App. 478, 80 S. W. 557; Southern Pac. Ry. Co. v. Kennedy, 9 Tex. Civ. App. 232, 29 S. W. 394.

◼ The facts in the instant case show that at the time Durden shot appellee, he, Durden, had authority to control the movements of the engine switching the show cars. He had the right to prevent any interference with the engine crew and to protect his employer's property, as well as the life and safety of the train crew and other persons from improper switching of the show cars upon any signals of appellee. Appellee had no right to direct engine or train movements by signal, but had only the right to request and direct Durden as to the manner of placing the show cars for loading. Appellee approached Durden, complaining of the manner he was doing the switching, giving "a violent signal," which, if observed by the engine crew, would have moved the engine and train contrary to the direct order of Durden. Durden told appellee not to "fool with" him. Durden testified that appellee "was walking towards me right fast * * * giving this violent signal"; that appellee "give a signal just before I shot him"; and that it was positively against appellant's rules controlling him for "any outsider to give signals." The jury were authorized to conclude from this evidence that Durden was acting within the scope of his authority or employment in telling appellee to get away and to not interfere with his signals; and that the shooting of appellee by Durden immediately grew out of Durden's efforts to prevent appellee from giving signals and from interfering with him in the performance of his duties as engine foreman for appellant; and, for the wrongful assault thus made by Durden upon appellee, appellant is liable under the rules stated. And since the jury found upon sufficient evidence that the shooting of appellee by Durden immediately grew out of the performance of an "act done in the doing of that which he was employed by defendant Railroad Company to do," appellant could not relieve itself of liability by showing that Durden exceeded his authority, or that he shot appellee with his own pistol, which he testified he was carrying in violation of the rules of appellant, or that Durden may have committed an illegal act, or that he shot appellee through lack of discretion or judgment, or because of ill temper. It is not the illegal, malicious, unauthorized, or negligent act of the servant which is required to be within the scope of the employment, or the authority of the servant, or in the furtherance of the master's business, because, under the rule above announced, the master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act. Or, as said in the case of Hudson v. Ry. Co. (Tex. Com. App.) 293 S. W. 811, 813: "Of course, an employer never employs a servant to be negligent or to commit an injury to any one in the course of his employment. Nevertheless, he is liable in those cases where such negligence or other wrongful act occurs within the scope of the employment." International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; International & G. N. Ry. Co. v. Cooper, 88 Tex. 610, 32 S. W. 517; Burnett v. Oechsner, 92 Tex. 588, 50 S. W. 562, 71 Am. St. Rep. 880; Chicago, R. I. & G. Ry. Co. v. Carter (Tex. Civ. App.) 250 S. W. 192.

◼ Second. With respect to the incidents of time, place, and quality, a tort of the servant is deemed to be within the scope of his employment, and imputable to the master, when the servant makes an assault upon the aggrieved party as the result of a quarrel which immediately grew out of the performance of the duties the servant was employed by the master to do. The intent or motive

which prompted the servant to commit the assault will not relieve the master of liability under this rule; but the motive and intent of the servant may be considered, in case of doubt, in determining the primary issue of whether the act was within the scope of the servant's employment. Durden testified fully as to his motive and intent or reason for the shooting of appellee, and the jury rejected appellant's plea that the shooting was not within the scope of Durden's employment. Durden testified that he shot appellee solely through fear that he was going to kill or injure him; and the jury upon sufficient evidence rejected appellant's plea of self-defense on the part of Durden. There were no specific pleadings that Durden shot appellee solely as the result of resentment of an insult or personal animosity, or bad feeling. No issue was submitted or requested to be submitted as to whether he shot appellee solely for these reasons; but such proof as bore upon the issue was introduced and considered by the jury in determining whether the act of Durden was within the scope of his employment.

Some contention is made in appellant's brief that Durden "stepped aside from his duties" and shot appellee with his own gun, purely as a personal matter. In support of this contention, appellant cites cases where guards, conductors, or peace officers have assaulted or shot intruders or trespassers, and were held to have acted within the scope of their employment; but appellant contends that no analogy or similarity existed between those cases and Durden in the performance of his duties as engine foreman, which did not require him to arm himself in the performance of his duties. We agree that the cases on fact are not entirely similar, but the rule announced in those cases with reference to particular facts is not necessary to establish liability in the instant case. No well-considered case is cited which holds that, when a servant makes an assault upon a third party as the result of a quarrel which immediately grew out of the performance of the duties the servant was employed by the master to do, the master is not liable. Under facts very similar to those of the instant case, the Commission of Appeals, in the case of Chicago, R. I. & G. Ry. Co. v. Carter, 261 S. W. 135, 136, held the master liable for the tort of its flagman in shooting Carter as the result of a quarrel immediately growing out of Carter undertaking to use the crossing at which the flagman was employed. The facts showed that the flagman ran out and grabbed Carter's team; that a quarrel ensued as to the manner in which the flagman was discharging his duty of stopping the team. Carter got off his wagon and used some vile language to the flagman, who went into his shanty and returned immediately with a gun and shot Carter. The court held, as follows: "That the flagman was clearly acting within the scope of his employment at the time the personal controversy began there can be no doubt, and the facts also clearly show that the difficulty was a continuous one from the time it began until the shooting, as found by the jury. The whole time of the difficulty was very short, and it would be extremely difficult for us to determine just when the flagman ceased to act within the scope of his employment and began to act as his own master, if he was so acting at the time of the shooting, and under the peculiar facts of this case we do not think that the law can undertake to say just when the flagman ceased to act as agent, or that he did so cease, but that the finding of the jury on that matter should govern."

The jury found in the instant case, in answer to special issue No. 1, and the instruction in connection therewith, that the shooting of appellee by Durden immediately grew out of the performance by "Durden of his duties in the doing of that which he was employed by defendant Railway Company to do," and that finding of the jury is sufficiently supported by the evidence and should stand.

By proposition 6, appellant contends that the jury's answer to special issue No. 1 should not stand, because the overwhelming preponderance of the testimony shows that Durden was not acting within the scope of his employment, or in the furtherance of his employer's business in shooting appellee; but that the shooting was the culmination of a personal difficulty, and threats communicated, and bad feeling engendered thereby. There were no specific pleadings that the shooting was the result of these matters, and Durden testified that through fear of losing his own life, and not because of bad feeling, he shot appellee. We have found that the jury's answer to special issue No. 1 is sufficiently supported by the evidence, and that finding concludes this proposition.

By propositions 7 to 13, both inclusive, appellant contends that special issue No. 1, and the instruction in connection therewith, do not include all elements necessary to fix liability of the appellant for the assault made upon appellee by Durden, in that the issue does not submit the questions of whether Durden was acting within the scope of his employment, or whether the assault was done in the furtherance of appellant's business, or whether the assault was done in the accomplishment of the object Durden was employed to do for appellant. It is also contended that the language, "an act done in the doing of that which he was employed to do," as used in the instruction given in connection with special issue No. 1, was indefinite, ambiguous, and confusing, and explained no term or language used in the issue. We do not sustain these contentions. The special issue and instruction clearly submit for the jury's finding whether the shooting of appellee by Durden immediately grew out of the performance by

328

Durden of the duties which he was employed by defendant railway company to do. That was the issue of liability made by the pleadings and proof. There are many ways of submitting the issue of whether an act of a servant is within the course of his employment. The issue here was not whether the actual shooting was authorized, but whether the shooting immediately grew out of the exercise of an authority which the appellant had conferred upon Durden. Or, as is said in Wood on Master & Servant (2d Ed.) 566: "The question is not whether the particular act was authorized, but whether the act done grew out of the exercise of an authority which the master had conferred upon the servant."

The submission of the stereotype language of whether the act of the servant was within the scope of his employment, or whether the act of the servant was in furtherance of the master's business, or whether the act of the servant was within the scope of his authority, in a special issue, is calculated to confuse the jury where the act is unlawful or wrongful, or negligent, because it is seldom, if ever, that the master authorizes such an act. If such an act is not shown to have been authorized or sanctioned by the master, it is difficult for the jury to understand how the act could be within the scope of the servant's employment, or how it could be in furtherance of the master's business, when in fact the act is detrimental to it. The object of special issue verdicts is to obtain jury findings upon specific issues of liability. So in the instant case, the inquiry was not whether the shooting was authorized or whether within the scope of Durden's employment or authority because it was not; but the sole inquiry was whether the unlawful shooting "immediately grew out of the performance by said Durden of his duties," which duties were clearly defined by the instruction given in connection with the issue as being "an act done in the doing of that which he was employed by the defendant Railway Company to do." This definition was given because of the objection of appellant that the special issue submitted did not define the term "immediately grew out of the performance by said Durden of his duties," and was no doubt phrased from language found in Wood on Master & Servant, 571, as follows: "If it was an act done in doing that which he employed the servant to do, although done contrary to the master's will; against his instructions, and without his knowledge, although unnecessary to accomplish the work, ill-advised, malicious or wanton, he is liable because he has set in motion the agency that produces the wrong."

Courts and text-book writers use the terms, "an act done in doing that which he employed the servant to do," and an act done "in the course of his employment," and an act done "within the scope of his employment," and an act done in "line of duty," and an act done in the "employer's service," indiscriminately and interchangeably, with reference to pleadings, proof, and charges to the jury in cases of this character; and the use in this case of the term, "an act done in the doing of that which he was employed by the defendant Railway Company to do," is not different in meaning or purpose. 39 C. J. 1282.

By propositions 14 and 15, appellant contends that the court erred in excluding testimony of vile epithets used by appellee to Durden on Monday preceding the shooting on Saturday. The testimony was excluded on the ground that "abusive language on previous occasions was not admissible except in mitigation of damages." Appellant did not seek to introduce the testimony in mitigation of damages, and does not now claim that the damages assessed were excessive; but sought to introduce the testimony as showing that the shooting was the personal matter of Durden, and not an act done in the furtherance of appellant's business. Testimony of threats made on Monday in connection with the use of the vile epithets was admitted in evidence on the primary issue of whether the shooting immediately grew out of the performance by Durden of that which appellant had employed him to do. The testimony was undisputed that the quarrel between Durden and appellee grew out of the manner Durden was doing the switching operations as an employee of appellant, and that the shooting immediately followed the quarrel. The evidence is also undisputed that on Thursday, after appellee used the vile epithets to Durden on Monday, they rode together on a show car and transacted business; and that on neither of these occasions did Durden assault appellee for using the vile epithets to him on Monday. Immediately preceding the shooting the same vile epithets, except possibly one word, or epithet, were used by appellee to Durden, and Durden positively testified that he did not shoot appellee "because he cursed me." Durden was appellant's witness, and his truthfulness was vouched for by appellant; and under these circumstances we are unable to see how any harm resulted to appellant in excluding the proffered testimony, even if it had been admissible. And especially is this true in view of the rules that abusive language will not justify an assault; and that if a servant commits an assault in the discharge of his duties for the master because of provoking language or conduct of the aggrieved party, the master is nevertheless liable, and the master can relieve himself of liability only when the servant is justified or when the servant acted in his necessary self-defense; and this is true not because the assault was the personal act of the servant, but because the servant made the justifiable assault while acting for the master. Dillingham v. Russell, 73 Tex. 47, 11 S. W. 139, 3 L. R. A. 634, 15 Am. St. Rep. 753; Galveston, H. & S. A. Ry. Co. v. La Prelle, 27 Tex. Civ. App. 496, 65 S. W. 488.

The authority 5 C. J. 644, states the rule with respect to previous abusive language, as follows: "To entitle defendant to offer circumstances of provocation in mitigation of damages, their occurrence must have been so recent and immediate as to induce presumption that defendant's act was committed under the immediate and continuing influence of the excitement and passion excited thereby. Where the assault is committed after time for reflection and deliberation, or in revenge, evidence of provocation is inadmissible."

Our courts have held that cursing and insulting words or epithets used some days previous to the assault are not admissible even in mitigation of damages, and, where so recent as to be admissible, they may be considered only in mitigation of exemplary damages. Parham v. Langford, 43 Tex. Civ. App. 31, 93 S. W. 525; Galveston, H. & S. A. Ry. Co. v. La Prelle, 27 Tex. Civ. App. 496, 65 S. W. 488; Harvey, Inc., v. Comegys (Tex. Civ. App.) 233 S. W. 601; Harrison v. Moseley, 31 Tex. 608; McCormick v. Schtrenck, 59 Tex. Civ. App. 139, 130 S. W. 720.

By propositions 16 and 17, appellant complains of the exclusion of testimony of other events or observations of witnesses on Monday preceding the shooting on Saturday. These are not sustained, because the bills of exception show the proffered testimony not responsive to the question propounded, or that the answer called for an opinion and conclusion of the witness.

We find no error in the judgment, and it is affirmed.

**Affirmed.**