## BELO v. WILLIAMS & STEPHENS.
### No. 10468.

Court of Civil Appeals of Texas.   Dallas.
Feb. 8, 1930.
Rehearing Denied March 8, 1930.

Read, Lowrance & Bates, of Dallas, for appellant.

W. F. Bane and Coker & Wilson, all of Dallas, for appellee.

VAUGHAN, J.

This is an appeal from a judgment rendered on the 3d day of May, A. D., 1928, in favor of appellees, Walter L. Williams and Arthur P. Stephens, partners composing the firm of Williams & Stephens, against appellant, Mrs. Helen P. Belo, for the sum of $5,000, with interest thereon at the rate of six per cent. per annum from date of judgment. The following abridged statement of appellees' pleadings is sufficient to present the grounds of their cause of action against appellant.

Appellees, real estate agents, transacting business under the firm name of Williams & Stephens, in the city of Dallas, sued appellant upon an alleged implied contract to pay a commission for appellees having procured one Will R. Sparkman as lessee of property owned by appellant, in the city of Dallas, alleging that they interested said Sparkman in said property and so notified appellant, and as a result thereof negotiations were entered into between said parties, which terminated in appellant leasing to said Sparkman the property described in appellees' pleadings under a lease contract dated November 24, 1925, for a term of 50 years at a rental of $650 per month; that the commission appellees claimed was impliedly agreed to be paid by appellant to appellees by reason of appellant having inquired of appellees what such commission would be, and, after being informed of the amount and time of payment thereof, appellant entered into the negotiations which resulted in said lease being executed without objection to the amount of commission to be paid or terms thereof; and in the alternative appellees alleged that the commission sued for was the reasonable value of the services rendered and the usual and customary amount paid for such services in the city of Dallas at that time.   Appellant's defense was presented by general denial, and special denials, viz.:   That appellees, nor either of them, were the efficient and procuring cause of the lease contract alleged to have been made; that while she never employed appellees, or either of them, to secure a tenant or to make a lease of the property described in appellees' petition, she did enter negotiations with appellee Williams concerning an offer to lease said property, made by Loudermilk-Sparkman Company; that such negotiations were made long prior to the making of said 50-year lease, terminating without satisfactory results having been accomplished for appellant, and that said 50-year lease was long thereafter made through new and independent negotiations; and by special pleas, in effect that in response to the telegrams pleaded by appellees, appellant came to Dallas in June,

1924, and endeavored to consummate a lease and was willing to pay a commission if the lease could have been made; that the proposed lessee was unable to pay the rent as offered and the deal failed; that soon after said failure to lease notice was given that all negotiations were terminated, that if any efforts were put forth thereafter by appellees to lease said property same were without the knowledge or consent of appellant.

The cause was submitted to a jury on fourteen special issues, and by the answers made thereto the following findings were made: That appellees, Williams & Stephens, were the procuring cause of said lease contract being made between appellant and W. R. Sparkman; that prior to July 23, 1924, appellant employed appellees and agreed to pay a commission in the event they leased said property; that W. R. Sparkman first endeavored to lease from appellees the property involved; that appellant understood, prior to July 23, 1924, and during the negotiations with said Sparkman, prior to that date, that appellees expected to receive compensation from appellant in the event they should bring about the execution of a contract leasing the property in question; that appellant, prior to July 23, 1924, and during the negotiations with said Sparkman to lease him the property involved, and prior to said date, intended or expected to pay appellees for their services in the event they should bring about the execution of a contract leasing the property in question; that Cloyd H. Read, one of appellant's attorneys, during said period of time, understood that appellees expected to be paid a commission if they procured the execution of a lease contract, and that appellees would be paid a commission by appellant; that appellant, through Cloyd H. Read, on or about July 23, 1924, did not terminate all negotiations with appellees for the leasing of the property in question to said Sparkman; that after July 23, 1924, appellees continued negotiations with Sparkman for the purpose of leasing to him the property in question; that appellant knew of some of the negotiations that took place after July 23, 1924; that appellant authorized them to continue the negotiations for the purpose of leasing the property to said Sparkman; that appellant accepted, ratified, and confirmed such negotiations with W. R. Sparkman by appellees after July 23, 1924; that appellees are entitled to a reasonable commission for services rendered in the leasing of the property in question; that $5,000 is a reasonable compensation due appellees by appellant for the services rendered.

Under the view we take of this cause, it is only necessary to consider appellant's assignment of error No. 1, namely: "The court erred in refusing to give the jury the peremptory charge in favor of defendant;" therefore, we shall not consider the effect of the findings of the jury in response to the special issues submitted, leaving that to be accomplished in the discussion of the issues between the parties, as same must be settled by a proper application of the rules of law to the following undisputed facts by which the rights of the parties alone can be ascertained and determined. Appellee Williams first met appellant in the early fall of 1922, at the old Belo home on Ross avenue and Pearl street, in the city of Dallas. At this time said appellee attempted to obtain from appellant a listing with appellees of the property involved, to sell to the Loudermilk-Sparkman Company, engaged in the undertaking business. His efforts were unsuccessful, appellant declining to sell the property to an undertaking establishment under any consideration. In the spring of 1924, said appellee had another conversation with appellant in reference to the sale of said property to Loudermilk-Sparkman Company, in which she informed said appellee that she had changed her mind and would now consent to sell the property to the Loudermilk-Sparkman Company if they still wanted it. Appellee's efforts to make sale of said property to Loudermilk-Sparkman Company were futile. Mr. Sparkman stated to said appellee that he would have to call the sale off because his attorney, Mr. Milam, and his stockholders, people in the company with him, would not allow him to buy anything else as long as he had the Maroney property on hand, being property located at the corner of McKinney avenue and Harwood street, which the Loudermilk-Sparkman Company had purchased through appellees for $68,000; that, in his second conversation with appellant, appellee Williams stated he was "afraid there would not be much chance to sell the house to them" because they had purchased the Maroney property at the corner of McKinney avenue and Harwood street. The second conversation between appellee Williams and appellant was some time after appellees had sold to Loudermilk-Sparkman Company the Maroney property. Said appellee had only the two personal conversations with appellant. In another conversation between Sparkman and appellee Williams the question of leasing the property involved was discussed, and appellee Williams, on the 24th day of May, 1924, sent the following telegram addressed to Allen T. Morrison or Mrs. Belo, 993 Park avenue, New York City, N. Y.: "The deal with Womens Club here is off; I can get straight 99 year lease payable in advance yearly at $650 per month from Loudermilk-Sparkman Co. Must have answer soon as possible please," and before receiving an answer to the above wire sent the following: "Loudermilk-Sparkman Co. must vacate their present quarters by June 15. Mr. Read informs me legal arrangements can be made whereby you can execute papers on your return from Europe. If telegraphed proposal of May 24 acceptable please wire Mr. Read and we can

arrange to your satisfaction regarding disposal of furniture etc." Appellant replied to the above wires as follows: "Have wired Mr. Read to make all arrangements and wire me whether to come or not; time is very short and I would like if possible to reserve attic until Fall; could easily empty two first floors;" and of date May 30, 1924, the following wire was sent by appellee Williams to appellant: "Mrs. Helen Belo, 993 Park Avenue, New York City, New York. Regarding commission. I would be willing to take $2500 when deal is closed and $2500 when rent is paid for next year. I feel I have made you a splendid deal and that you should accept it while you can get it. Must have answer at once."

At the time appellant sent the first wire to appellee Williams she wired to her attorney, Cloyd H. Read, of the firm of Read, Lowrance & Bates, as follows: "A wire from Williams reads, 'I can get 99 year lease payable in advance yearly at $650 per month from Loudermilk-Sparkman Co.' Are you sure I can make a 99 year lease on entailed property, and what would I have to pay in Federal tax on such a lease. I will do nothing without your advice. If you think favorably I will. You see Williams and make it clear to him you are my attorney and advisor in all things and then wire me your advice. Also whether I could have until November 1 to vacate. Letter received regarding Dallas Co."

To the next preceding wire, Cloyd H. Read sent the following wire to appellant, of date May 29, 1924: "Williams says tenant interested because must move in 90 days and possession needed accordingly. Williams commission $5000. Federal tax uncertain until exact papers known. Lease would require signatures of yourself and both your daughters. Writing concerning terms of lease." On May 29, 1924, appellant sent to said Read the following wire: "I am going to Europe June 26 and must be back in New York July 17. If you think Williams proposition too valuable to lose I could be in Dallas June 2 as I am the only one who could get house ready. Jane can come if necessary. Mr. Morrison thinks he should graduate lease and I would insist upon $7800 they to pay taxes and repairs that is net to me. I would prefer a ten-year lease under these conditions as Dallas is growing rapidly. Answer." On May 30, 1924, the following wire was sent to appellant by Cloyd H. Read: "Your telegram exhibited to Williams and Cammack. Williams is sending separate wire about commissions. Cammack and myself recommend Sparkman offer if commission can be arranged. Believe details of lease can be satisfactorily arranged on 50-year term but not shorter and not on graduated basis." Under date of May 30, 1924, Cloyd H. Read sent the following wire to appellant: "Williams claims that Allen T. Morrison authorized 90 year lease $500 per month and that Spark-

man's larger offer justifies full commission. I told Williams would only recommend $2,500 commission but he refused accept. Cammack and myself think Sparkman offer real opportunity and with your instruction could have furnishing safely stored until you return from Europe." Appellant replied by wire on May 30, 1924, to the last preceding wire as follows: "Must leave Williams commission in your hands. Arrange for more than one payment. Can start Monday. Shall bring Jane. Must be sure that they pay taxes and repairs before starting. Inform Mr. Cammack and have him wire me if Sue and Arthur can come to me. I want to stay at the house." The following wire, dated Ashville, N. C., June 6, 1924, was sent by Allen T. Morrison to appellant: "Your letter Helen stating Williams represented that I agreed lease ninety nine years five hundred month received. I made no agreement with Williams or anyone else and took precaution to advise him in presence of witnesses that I had no authority to make any agreement. There was no discussion with Williams or anyone else about straight lease as per your letter to me of April 1. Suggest you break off negotiations with Williams."

Appellant came to Dallas after the sending and receipt of the above telegrams. Appellee Williams did not meet her, and never did discuss with appellant the question of leasing the property, or payment of commission, further than the contents of said wires. Appellee Williams first discussed with Sparkman the leasing of the property involved when Sparkman told him that his attorney and partners would not permit him to buy the property. Then said appellee suggested to Sparkman that they "try to make a lease on said property." Sparkman finally made said appellee an offer, which was submitted by him to appellant in his first wire. Appellant came to Dallas in June, 1924, for the purpose of giving further attention to the matter of leasing the property to Loudermilk-Sparkman Company. Appellee Williams, although advised that appellant was in the city, did not see her while there, and the involved property was not leased to Loudermilk-Sparkman Company.

In reference to why the negotiations for the leasing of the property involved were futile, appellee Williams testified: "I do not know for sure that it is a fact that when Mrs. Belo came here Sparkman could not pay the money in advance. Sparkman did not tell me he could not, he told me he could not pay her as much money as she wanted, and the lease fell through on that account. I never did get any lease signed up with Sparkman." As to the involved property being listed with appellees to lease, appellee Williams testified: "There were telegrams regarding leasing of the property, but I judge from your question, was whether Mrs. Belo had ever given me any letter or telegram authorizing me to lease the

property. She never did. She never gave me any authority to lease this property. Don't claim that she listed it with Mr. Smith or Mr. Stevens. I don't claim that Mr. and Mrs. Morrison listed it with me. I would not judge that they had authority to. I never had any listing in any letter from anyone. All of the listing I had was from Mrs. Belo. And those two times were the only times I ever talked to her and I don't claim anybody other than Mrs. Belo ever listed it with me, authorizing me to make a lease."

After the failure in June, 1924, to lease the property involved to Loudermilk-Sparkman Company, to wit, on July 23, 1924, the following letter, signed Read-Lowrance & Bates, by Cloyd H. Read, was addressed to and received by appellees: "In Re: Loudermilk-Sparkman Company lease with Mrs. Belo. The further development of this matter indicates that Mr. Sparkman will not be able to carry out any contracts along the lines of our discussion, and therefore notice is hereby given that all negotiations are at an end, and we reserve the right to proceed with other deals and if you have a deal with any other party on a similar line you can take up same with this firm as Mrs. Belo is in Europe and has authorized us to look after the matter for her."

From the date of the above letter, no other communication passed between appellant and appellees until November 9, 1925, when appellee Williams addressed to appellant the following letter, she then being in Dallas, Tex.: "I have just learned that you were in the city and I am writing to say that I think there would be a chance of our going through with the deal we had up some time ago with Mr. Sparkman, of the Loudermilk-Sparkman Undertakers. I would like very much to see you and talk over the matter again, if you will be so kind as to advise me when and where I may see you." To this letter no reply was made, and it was the first and only communication received by appellant from appellees after July 23, 1924. In reference to the letter of date July 23, 1924, appellee Williams testified: "Outside of this letter, Mrs. Belo never wrote me any other letter instructing me to discontinue my efforts with Sparkman. Never heard any more from her."

The property involved was leased by appellant to W. R. Sparkman by contract of date December 24, 1925, for a period of 50 years, from and including December 1, 1925, in consideration of the payment of the sum of $390,-000, payable in amounts and on dates so that the payments to be made under the terms of said lease averaged about $650 per month. After receiving letter of date July 23, 1924, appellee Williams did not inform appellant, or Read-Lowrance & Bates, nor either of them, that he was going to or had any intention to proceed further with negotiations to lease the property to Sparkman, or Loudermilk-Sparkman Company, and appellant had no dealings with appellees in reference to leasing the property, other than with appellee Williams.

In reference to the basis of appellees' claim for the commission sued for, appellee Williams testified: "I base my claim on the fact that I wired Mrs. Belo regarding the leasing of the property and she wired me back regarding the leasing of it on two or three different occasions and I considered that was sufficient evidence that I had the leasing of the property and she was willing for me to go ahead and make a lease on it." And as to why appellee Williams did not have any further negotiations, either with appellant or her attorney Read, after receiving the letter dated July 23, 1924, said appellee testified as follows: "I did not discontinue my efforts with Sparkman on receipt of that letter, because I knew that I was still able to make the lease. As to why I did not write or wire Mrs. Belo again after getting that letter, I was still working on Sparkman and we did not have anything definite. If I had come to a definite conclusion after that regarding the lease, I would have wired her or would have taken it up with Mr. Read, one or the other. There was not anything definite done, that is, the reason I did not make any overtures to either one of them regarding going through with the lease."

Neither appellant nor her attorney Read knew of any further efforts that were being put forth by appellees, or either of them, to lease the property to Sparkman, or to the Loudermilk-Sparkman Company, after July 23, 1924.

That Sparkman had full information as to the ownership of, location, and the suitableness of the property involved for the requirements of his business prior to the time he was induced by appellee Williams to permit him to negotiate for the leasing of said property, and desired prior thereto to obtain a lease thereon, is shown by the following uncontradicted testimony of said Sparkman, and one R. B. Cammack, viz., by Sparkman: "I first saw Mr. R. B. Cammack a short time after I came here, when I was buying the business from Loudermilk and I went back to see him probably along in September or October of about 1920 about the lease or purchase some way or another of getting hold of this piece of property of Mrs. Belo. At that time he said she would not sell it for the business for which I wanted to use it for. At least he took it up with her and his answer was * * * in fact she was away from here and wrote her. He got an answer from her. I was down to see Mr. Cammack three or four times and he said she would not sell or lease it for that purpose. I think that was probably a year or more before I entered into conversation with Mr. Williams about it;" and by said Cammack as follows: "He (Sparkman) came to me about

it. He was very anxious to get control of the property, either buy or lease. That was after he bought out the Loudermilk Undertaking Company. I could not say whether it was soon thereafter or long thereafter. I could not remember the year. I suppose as far back as 1920. He said it was the most suitable place he had been able to locate in Dallas for his business and he was very anxious to get control of it. He had me to take it up with Mrs. Belo on several occasions. At that time she said she would not consider selling for the purpose for which he wanted it."

As to the beginning of the negotiations that finally resulted in the lease of the property being made to said Sparkman for a term of 50 years, he testified: "When I took the lease up with you (referring to Cloyd H. Read, who examined the witness), I asked you to take it up with Mrs. Belo direct and if I could talk to her direct. I did not want to deal through the third party. My own reasons for that. Thereafter, when I did further negotiate I did not have anybody else in the matter."

As to why negotiations to lease the property for a period of 99 years conducted by appellee Williams failed, said witness testified: "As to why I wanted to deal with Mrs. Belo direct; before they wanted me to guarantee the commission, and that is the other part of it. I wanted to deal with her to save commission because I would have had to guarantee the future commission. That is what broke it up before, the first time. As to whether I am positive that is what broke it up the other time, or postponed it in 1924, it was not anything else, just a fight over the commission. That is exactly it. They wanted me to guarantee the payment of the commission so it would eventually come out of the profit. I would not do it. It meant I would have to advance the money or make a note for it."

As to why negotiations to lease the involved property were resumed, said Williams, without contradiction in the record, testified: "After that deal was closed, after that transaction was dropped (referring to the negotiations for a 99 year lease) then, I don't remember just the exact date, but somewhere about September 1925 * * * I think that is about the date when I went to see you (referring to Cloyd H. Read) and asked you if she (appellant) would reconsider this lease proposition, some deal that I wanted to take up with you. That was about September 1925 * * * I had no reason for taking it up with her but when I did sell the other property I went right back to see if I could buy or lease, went to you directly, she had reconsidered."

Along said lines said witness further testified: "As to whether I knew that I could not go through with the lease on the Belo prop-

erty until I sold the property on McKinney Avenue and Harwood Street, I did not want to. In June 1924 the number of years of the lease was agreed to in the contract that was drawn up * * * it was not executed * * * I did not agree to it when they brought up the question you asked me while ago about the commission."

From the above undisputed testimony, we find the following facts to have been established: That only a restricted or special listing was made to lease the property to W. R. Sparkman for a period of 99 years, at a rental of $650 per month, during such period of time, payable in advance; that after being accorded reasonable time in which to conduct negotiations, appellees, without any fault on the part of appellant, failed to consummate a lease to said Sparkman; that the only listing made by appellant with appellees of said property, for the purpose of leasing same, was by and through the telegrams interchanged between appellant and appellee Williams; that the failure to consummate said proposed lease was not due to any connivance for that purpose had by and between appellant and W. R. Sparkman, and was not a postponement for the purpose of resuming the negotiations later on the part of appellant, for the purpose of defeating appellees' right to receive a commission for services rendered as real estate agents; that during the period of time from June 19, 1924, to September, 1925, no negotiations were had by Sparkman with appellant or Cloyd H. Read, for the leasing of said property; that neither appellant nor said Read were informed by appellees, or either of them, or received information from any other source, from July 23, 1924, to November 24, 1925, the date the 50-year lease was made to Sparkman, that appellees, nor either of them, continued to negotiate with said Sparkman, for the purpose of leasing said property to him; that said Sparkman voluntarily, on or about the 25th day of September, 1925, and without solicitation of appellant or any one acting for her, resumed negotiations with appellant's agent Read for the purpose of leasing the property, and, through negotiations conducted by said parties in which appellees had no connection, the lease for 50 years was made on November 24, 1925.

██ What is the legal effect of the telegrams that passed between appellant and appellees, and the telegrams received from appellant by her agent Read (exhibited to appellee Williams), in reference to the leasing of the property for 99 years to said Loudermilk-Sparkman Company, is the initial inquiry and presents a question of law, the terms of said telegrams not being vague or uncertain of meaning. We hold that the first telegram sent by appellee Williams to appellant was only a request for permission to negotiate with Loudermilk-Sparkman Com-

pany for the purpose of leasing the property to them for a period of 99 years at a rental of $650 per month, payable in advance, and that the other wires under discussion only conferred upon appellees authority to negotiate with Loudermilk-Sparkman Company for the purpose of leasing to them appellant's property for a period of 99 years at a monthly rental of $650, payable in advance, provided same could be accomplished on terms and conditions acceptable to appellant, there being reserved for determination later on, the questions, viz.: Amount of commission and manner of its payment, surrendering possession of the property, reservation of the attic until fall, in which to store appellant's household goods, a graduated lease, payment of taxes, repairs, amount of cash payment, and the duration of the lease, whether it should be for 10, 50, or 99 years, which were to be disposed of before reaching a final agreement leasing the property. Without any fault on the part of appellant, appellees failed, within a reasonable time, to lease the property to Loudermilk-Sparkman Company on terms and conditions authorized by and acceptable to appellant. The authority conferred upon appellees to lease appellant's property not being for any specified time, there rested with appellant the right to terminate such listing, appellees having been accorded a reasonable time within which to prosecute negotiations for that purpose and having failed in the undertaking, and thereafter to lease the property to Loudermilk-Sparkman Company without becoming liable for the payment of commission to appellees. Pryor v. Jolly, 91 Tex. 86, 40 S. W. 959; Goodwin v. Gunter et al., 109 Tex. 56, 185 S. W. 295, 195 S. W. 848; Parkey v. Lawrence (Tex. Civ. App.) 284 S. W. 283; Rogers-Hill & Co. v. San Antonio Hotel Co. (Tex. Civ. App.) 7 S.W.(2d) 601.

What is the legal effect of the letter of date July 23, 1924, from Read to appellees, on the listing made for leasing the property? Was it sufficient to terminate same? This involves the construction of the language of a written instrument; therefore it presents purely a question of law, the instrument not being vague or uncertain within its terms. The language of said letter, "The further developments of this matter indicate that Mr. Sparkman will not be able to carry out any contract along the lines of our discussion, and therefore, notice is hereby given that all negotiations is at an end," could have but one meaning, namely—that all negotiations to lease the property to Loudermilk-Sparkman Company was at an end—in other words, the listing made by appellant of her property with appellees was revoked.

It is to the following language that appellant and appellees attach the greatest degree of importance, viz.: "If you have a deal with any other party on a similar line, you can take same up with this firm as Mrs. Belo is in Europe and has authorized us to look after the matter for her," appellees contending that same was not a termination of their agency for the purpose of leasing the involved property, but an invitation for them to continue further efforts in her behalf in that respect, while on the other hand, appellant urges that its effect was to authorize appellees to proceed with any other then pending deals with other parties for the purpose of leasing the property for a period of 99 years at a monthly rental of $650, payable in advance, and had no reference to any deal or transaction for that purpose that might arise after the date of said letter. In other words, was dealing with a situation in praesenti and not one to arise in futuro. The word "have," as used in said letter, is a transitive verb, expressing complete action and could only express but one meaning, namely, the present tense. See Webster's New International Dictionary for a full discussion of the use and meaning of the word "have."

Appellant's contention as to the legal effect of said letter is sustained. The letter of date July 23, 1924, and the telegrams that passed between appellant and appellees, and appellant and her agent Read (which were exhibited to appellees), in reference to the leasing of appellant's property, being neither uncertain of meaning nor doubtful of import, it was for the trial judge to determine the legal effect of said written instruments and the effect to be given same should not have been submitted to the jury for determination.

Under the undisputed material facts, the trial court erred in refusing to instruct the jury to return a verdict in favor of appellant.

This cause having been fully developed on the facts, the judgment that should have been rendered thereon by the court below is rendered by this court, viz., that appellees take nothing by this suit against appellant, and that all costs accrued in the court below and in this court be, and the same are, hereby adjudged against appellees.

Reversed and rendered.