## WILLIAMS & STEPHENS v. BELO.
### No. 1290—5766.

Commission of Appeals of Texas, Section B.
July 22, 1931.

W. F. Bane and Coker, Wilson, Rhea & Neel, all of Dallas, for plaintiffs in error.

Read, Lowrance & Bates, of Dallas, for defendant in error.

RYAN, J.

This suit involves the rights of plaintiffs in error to a real estate broker's commission because of a lease dated November 24, 1925, made by Mrs. Belo to Will R. Sparkman, of certain property in the city of Dallas, for a term of fifty years, the total consideration therefor being $390,000, payable in certain instalments as specified in the lease contract.

In answer to special issues submitted to them, a jury in the trial court found: That Williams & Stephens, or either of them, were the procuring cause of said lease contract; that Mrs. Belo, prior to July 23, 1924, employed them, or either of them, to lease the property in question and agreed to pay a commission in the event they so leased it; that Sparkman, lessee, first endeavored to lease such property from Williams & Stephens; that Mrs. Belo understood prior to July 23, 1924, and during the negotiations with Sparkman, prior to that date, that Williams & Stephens expected to receive compensation from her if they should bring about a lease contract on said property, and she intended or expected to pay them for their services in that event; that Cloyd H. Read (Mrs. Belo's attorney and adviser) also prior to July 23, 1924, understood that plaintiffs (Williams & Stephens) expected to be paid a commission if they procured a lease on said property, and

he (Read) expected and understood that Mrs. Belo would pay such commission.

The jury found further that Mrs. Belo, through Cloyd H. Read, did not, on or about July 23, 1924, terminate all negotiations with Williams & Stephens, looking to a lease of the property in question, to Sparkman; that they continued such negotiations with Sparkman, after July 23, 1924, and this was known to Mrs. Belo, who authorized plaintiffs to continue such negotiations, after July 23, 1924, and ratified and confirmed such negotiations after that date.

The jury found also that plaintiffs are entitled to a reasonable commission for the services they rendered in the leasing of said property to Sparkman, and that $5,000 is such a reasonable commission.

Judgment was accordingly rendered in favor of the plaintiffs, Williams & Stephens, and against Mrs. Belo for the sum of $5,000 with interest from date of judgment and all costs of suit.

The Court of Civil Appeals held that under the undisputed material facts the trial court erred in refusing to instruct the jury to return a verdict in favor of Mrs. Belo, reversed the judgment below, and rendered judgment in her favor. 25 S.W.(2d) 700.

■ The Court of Civil Appeals had authority to reverse the judgment of the trial court on the preponderance of the evidence, but it could not render the judgment, if, discarding all adverse evidence and giving credit to all evidence favorable to the plaintiffs, and indulging every legitimate conclusion favorable to the plaintiffs which might have been drawn from the facts proved, a jury might have found in favor of the plaintiffs. Wininger v. Railway, 105 Tex. 56, 143 S. W. 1150.

■ The effect of the holding of the Court of Civil Appeals is that there was no evidence of probative value supporting the jury's findings, and it therefore becomes a question of law, to consider which we must review the evidence as adduced on the trial. Marshburn v. Stewart, 113 Tex. 518, 254 S. W. 942, 260 S. W. 565; Beck v. Texas Co., 105 Tex. 303, 148 S. W. 295; Tweed v. Telegraph Co., 107 Tex. 247, 166 S. W. 696, 177 S. W. 957.

Williams, plaintiff in error, testified that he had been in the real estate business in Dallas since 1895; that he met Mrs. Belo by appointment at his solicitation, in the early fall of 1922, having learned that she desired to sell the property in question; that he informed her that he was sure he could sell said property to the Loudermilk-Sparkman people, undertakers; that she then refused to sell to an undertaking establishment under any circumstances.

He testified further that again in the fall of 1923 or spring of 1924 Mrs. Belo advised him that she had changed her mind and would now consent to sell the property to the Loudermilk-Sparkman Company, if they still wanted it, and she told him to go ahead and try to sell to them; that he then took the matter up with Mr. Sparkman, of the Loudermilk-Sparkman Company, who finally made him a lease proposition which he wired to Mrs. Belo, who was then in New York City; that he furnished Mr. Sparkman with estimates upon the value of the property between the 1st and 15th of November, 1925.

In May, 1924, Williams wired Mrs. Belo and Mr. Morrison, her son-in-law, in New York, as follows: "The deal with Womens Club here is off; I can get straight 99 year lease payable in advance yearly at $650 per month from Loudermilk-Sparkman Co. Must have answer as soon as possible." On May 26, 1923, Mrs. Belo wired Mr. Cloyd H. Read, her attorney at Dallas, Tex., as follows: "A wire from Williams reads I can get 99 year lease payable in advance yearly at $650 per month from Loudermilk-Sparkman and Co. Are you sure I can make a 99 year lease on entailed property and what would I have to pay in Federal Tax on such a lease. I will do nothing without your advice. If you think favorably I will. You see Williams and make it clear to him you are my attorney and advisor in all things and then wire me your advice. Also whether I could have until Nov. 1 to vacate."

The plaintiff in error testified further: "After I sent the telegram to Mrs. Belo advising her that I could get a ninety-nine year lease on her property from Loudermilk-Sparkman Company, Mr. Read 'phoned me to come up to his office in a few days—I would say, probably a week after that. I went up there and he told me he had received a letter from Mrs. Belo regarding the leasing of the property to Mr. Sparkman, and talked over the proposition with him, and he said, you better get Mr. Sparkman up there and go on through the proposition and see what there was to it. Then I made an appointment with Mr. Sparkman and Mr. Read and got Mr. Sparkman up there, together, going into this lease proposition with Mr. Read. I was present in that conference; I was up there fifteen or twenty minutes. Mr. Sparkman and I did not leave together; I left Mr. Sparkman there talking with Mr. Read on the proposition. I had an appointment and had to leave. I left Mr. Read and Mr. Sparkman going over the proposition. As to whether I took Sparkman to Mr. Read's office, I made an appointment with him and met him there.

"The next morning I went back up to Mr. Read's office and talked to him, and he told me he and Mr. Sparkman had made up a lease he felt would be satisfactory to Mrs. Belo. As to what I mean by 'made up,' I judge from that remark that they came to some agreement on the lease proposition.

"Mr. Read told me then that they had come to an agreement which he thought would be satisfactory to Mrs. Belo, and that she wanted to know what my commission would be in the deal and in regard to the lease and so forth, and he dictated a telegram for me to send to Mrs. Belo. I remember I said to her in that telegram what the lease was and that my commission would be five thousand dollars.

"I did have a discussion with Mr. Read at the time as to what my commission would be or what it should be; Mr. Read stated that the commission was a good, big commission, and he didn't know how Mrs. Belo was going to take it because Mr. Sparkman wasn't paying very much money, cash, in the trade.

"With reference to the recitation in the telegram that I would take twenty-five hundred dollars when the trade was closed and twenty-five hundred dollars out of the first year's rent, that was just because Mr. Read said Mrs. Belo wouldn't be getting much cash on the deal, and I agreed with Mr. Read that I would accept twenty-five hundred dollars when the deal was made and twenty-five hundred dollars out of the next year's payment of rent. Mr. Read dictated the telegram for me to send; I signed it and took it down to the telegraph office myself, and paid for it.

"I did have some further discussion as to my commission, with Mr. Read, at that time. There was no controversy whatever as to the amount of the commission.

"After sending that telegram, I got a telegram from Mrs. Belo regarding the storing of her furniture and went to see Mr. Sparkman and made satisfactory arrangements with him, and wired her to that effect—that we could arrange so that she could have the storage room she wanted in the attic of the building. After sending that telegram to Mrs. Belo stating that I had made arrangements for her to store her furniture in the attic, Mr. Read phoned me after a few days to come to his office again and told me he had heard from Mrs. Belo and everything was satisfactory and that she would be there on a certain date to sign up the lease. Then, after a few days more, Mr. Read called me to come up to his office again and I went up there and he told me that Mrs. Belo was in the city and that they had made arrangements to close up all the deal at two o'clock that afternoon; to be at his office at two o'clock. I would judge that I was up there between nine and ten o'clock in the morning. Then I went to Mr. Read's office at two o'clock in the afternoon as I agreed to and when I got up there he told me the deal was all off. He said Mr. Sparkman had been up there and he was unable to go through with the deal; that he and Mrs. Belo couldn't get together and that she was leaving that night for New York.

"When I left the office Mr. Sparkman and Mr. Read were together, and the drawing up of the lease and the details of it was left entirely to Mr. Read and Mr. Sparkman.

"I never heard a word in any way, shape or form about what demands Mrs. Belo made upon Mr. Sparkman to pay my commission at that time. I did not discuss with Mrs. Belo the matter of the rearranging of my commission; I never talked to Mrs. Belo at all. I never discussed with Mr. Read the matter of the rearranging of my commission, further than what I said awhile ago. I agreed to take twenty-five hundred dollars when the deal was made and twenty-five hundred dollars on the next year's payment. That was the only discussion Mr. Read and I had about the commission. After that I received a letter from Mr. Read relative to Sparkman and this property, after Mrs. Belo went back to New York. The letter, dated July 23, 1924, reads as follows:

"Messrs. Williams, Smith & Stephens,
    "Dallas, Texas.

"Gentlemen: In Re: Loudermilk-Sparkman Co. Lease with Mrs. Belo. The further developments of this matter indicate that Mr. Sparkman will not be able to carry out any contract along the lines of our discussion, and therefore notice is hereby given that all negotiation is at an end and we reserve the right to proceed with other deals and if you have a deal with any other party on a similar line, you can take up same with this firm; as Mrs. Belo is in Europe and has authorized us to look after the matter for her.

    "Yours very truly,
            "Read, Lowrance & Bates,
                "By: C. H. Read."

On November 9, 1925, Williams wrote Mrs. Belo, then in Dallas, as follows:

"Dear Mrs. Belo: I have just learned today that you were in the city and am writing you to say that I think there would be a chance of our going through with the deal we had up sometime ago with Mr. Sparkman of the Loudermilk-Sparkman Undertakers.

"I would like very much to see you and talk over the matter again if you will be so kind as to advise me when and where I may see you.

"Thanking you, I am
    "Yours resp'y,"

—to which no reply was received.

Williams further testified that he continued his efforts with Sparkman after he received the letter of July 23, 1924, from Read, Lowrance & Bates, "because I knew that Sparkman was still very anxious to go through with this deal. He told me so repeatedly, and I knew that was a chance for him to make this deal if he could get in shape to make it. He had repeatedly told me and urged Mr. Stephens to try and dispose of his property we had sold him on Harwood Street,

lease or sell it in order that he could go through and make this lease on the Belo property. I knew he wanted it, very anxious to get it, and I was certain Mrs. Belo would make a lease if he would go through with it and raise this money. By saying I was certain Mrs. Belo would make this lease I mean I knew from the fact that she was ready and willing to make it before, when he couldn't raise the money; that if he could raise the money she would go through with it.

"As to what I mean that I continued my efforts with Sparkman and what I did in continuing my efforts and how often I saw Sparkman and just what I did from the time of the writing of this letter of June 23d, Mr. Sparkman came in our office repeatedly and talked to Mr. Stephens and myself and I got out and tried to sell this property for him. Mr. Sparkman was making every effort and urging us to make every effort to dispose of this property on McKinney Avenue so he could go through with this lease.

"Outside of this letter, Mrs. Belo never wrote me any other letters instructing me to discontinue my efforts with Sparkman; never heard any more from her. She never told me in person to discontinue my efforts with Sparkman or anybody else.

"Mr. Read never told me or wrote me any letters telling me to discontinue my efforts with Sparkman or anybody else.

"I don't know when this lease was consummated. It was sometime in December, 1925, that I learned Mrs. Belo had executed this lease to Sparkman.

"The last time Sparkman was in my office relative to leasing this property before I found that she had leased it to him, he came down to our office, I think, on the 8th of November, 1925. He came down there and asked Mr. Stephens and me to get him up a strong letter regarding the Belo property; I mean a letter as to the valuation of the Belo property, as to the future valuation of the property, and so forth, and told us that he was wanting this because he was trying to get some men interested to let him have some money to go through with this lease, because he would need about fifteen thousand dollars or better to improve this piece of property before he could move into it. I did not see Sparkman any more between that time and December. I did not see Read or Mrs. Belo any more between that time and December, when I found out the lease was executed. * * * I allege in my petition that I was the agent of Mrs. Belo in this transaction. I base that claim on the fact that I wired Mrs. Belo regarding the leasing of the property and she wired me back regarding the leasing of it, on two or three different occasions, and I considered that was sufficient evidence that I had the leasing of the property, and she was willing for me to go ahead and make

a lease for it. I base it on the fact that she never turned me down on the lease or said she wouldn't lease it, or said she wouldn't have anything to do with me. I base it on the fact that I was trying to lease the property for her and she never rejected it. * * * In my petition, I make the allegation that I was Mrs. Belo's agent. I base the claim upon the fact that Mrs. Belo listed the property with me to sell. * * * I never did make any demand or request upon Mrs. Belo as to how and when she would pay my commission, except what I said in the telegram; that I would be willing to take twenty-five hundred dollars when the lease was made and twenty-five hundred dollars out of the next year's payment.

"They never did ask me to cut my commission or take it on any other basis."

Stephens, plaintiff in error, a member of the real estate firm of Williams & Stephens, testified he knew W. R. Sparkman, Mrs. Helen Belo, and Mr. Cloyd H. Read, and he had dealings with Sparkman or the Loudermilk-Sparkman Company, relative to the leasing of the property involved in this suit, and furnished Mr. Sparkman with statements as to the valuation of the Belo property. "Later on in the negotiations, he asked me for a written statement as to the valuation of this property and the possibilities of the property. I did furnish him with that. The first written valuations I gave were not in the form of letters, but just in memorandum I would put before him in trying to make the sale. That was in the early part of 1924. I gave him the first written list of valuation in November, 1925. I did not give him that voluntarily; he asked me for that valuation. I was on the street at that time when he first asked about it; he later came up to the office and asked for it, and we wrote it out for him and gave it to him. I say that was in November, 1925.

"I had other negotiations with Mr. Sparkman between the Fall of 1923 and the time I wrote the list of valuation in November, 1925. He had another piece of property that depended on whether we could dispose of that for him as to whether he could make this lease on the Belo property. I advertised that property for sale; I negotiated with three or four different people, so Mr. Sparkman would sell that other property, so he could go through with this lease. * * * The last conversation I had with Sparkman was at the time I wrote the letter in November of 1925.

"As to when I first found out that Mrs. Belo had leased this property to Sparkman, approximately the first of December we heard it rumored that they were negotiating among themselves. I did not know about the lease being drawn up and executed at the time it was executed."

Mr. R. B. Cammack testified that he has been connected with the Dallas News for thirty-three years, and looks after all of Mrs. Belo's personal affairs; that he knows Mr. Sparkman very well. "I have had conversations with Mr. Sparkman several times with reference to the property known as the Belo homestead on the corner of Ross and Pearl. He came to me about it. He was very anxious to get control of the property; either buy or lease. That was after he came here: after he bought out the Loudermilk Undertaking Company. * * * He said it was the most suitable place he had been able to locate in Dallas for his business, and he was very anxious to get control of it; he had me take it up with Mrs. Belo upon several occasions, at that time she said she wouldn't consider selling for the purpose for which he wanted it. Thereafter she told me of a change in her ideas—she said she had changed her mind."

He testified, further, that Mrs. Belo returned to Dallas about the 1st of June, 1924, in response to a telegram from Mr. Read on the prospect of closing a lease on her home to Mr. Sparkman. That lease was not closed because, as he understood, Mr. Sparkman could not make the necessary financial arrangements. "The next time I heard anything with reference to the proposition was just before the lease was made in 1925. I think, the last part of 1925.

"I have had the lease in my possession up until this morning. The date of the lease is the 24th of November, and I heard about it just shortly before that.

"I discussed that lease casually with Mrs. Belo and Mr. Sparkman prior to its execution. I talked to Mr. Sparkman about this property a good many times prior to this. * * * I talked with Mr. Read and Mrs. Belo with reference to the lease."

Mr. Sparkman testified that he talked to Mr. Williams many times about the Belo property and made an offer through him for a lease of it, and Mrs. Belo came to Dallas with reference to such lease, but that particular transaction was not closed, but after he (Sparkman) had sold some property of his, he, in about September, 1925, went to Mr. Read and asked him to take the lease matter up with Mrs. Belo direct, and then dealt with her through Mr. Read. He went to the office of Williams & Stephens several times during 1925 on deals affecting property he had bought and traded for. "As to why I wanted to deal with Mrs. Belo direct—before, they wanted me to guarantee the commission; I wanted to deal with her to save commission, because I would have had to guarantee the future commission; that is what broke it up before, the first time. As to whether I am positive that is what broke it up the first

time, it wasn't anything else; just a fight over the commission; that's exactly it; they wanted me to guarantee the payment of the commission, so it would eventually come out of the property. I wouldn't do it; it meant I would have to advance the money or give a note for it.

"Mrs. Belo never did ask me to pay more than the agreed rental of $650.00 a month on the property. As to whether they were asking me to pay rent, and not asking me to guarantee the commission, they did do it. That is why I wouldn't take it in 1924; that is where the disturbance came.

"When Mrs. Belo was down here in June of 1924, I had one or two conversations with her; I don't remember how many. Those conversations were in Mr. Read's office. * * * "I think Mr. Williams met us there. Mrs. Belo was there when Mr. Williams was there; they met there together. I don't remember whether that was in the morning or afternoon. As to whether that was the first or second conversation I had with Mrs. Belo when she was down here in 1924, I don't know whether there was one or more; I met her out at the house one time; just a day or two before the lease. Mrs. Belo was present and I think Mr. Williams was there; he or Mr. Cammack were out there. * * *

"As to whether it is a fact that Mrs. Belo and Mr. Read and Mr. Williams and myself all met up at Mr. Read's office when she was down here in June, 1924, to close the deal, of course, Mr. Williams was there with them. I imagine; I am sure he was. As to whether that is just guess-work, I know she was there, and as to Mr. Read, I am almost sure he was there with her. * * *

"In June of 1924, or at any time subsequent thereto, up until the time the lease was executed in 1925, I had no agreement of any kind with Mrs. Belo, expressed or implied, relative to paying this commission. * * *

"I had that conversation with Mr. Read about Williams' commission in the Fall. * * *

"I think Mr. Williams first told me that Mr. Read represented Mrs. Belo. I knew that Mr. Read represented Mrs. Belo in the Fall of 1925. * * *

"I did not know Mr. Read represented Mrs. Belo before Williams got in touch with me and took me up there in June, 1924. * * *

"When I went back to Mr. Read in the Fall of 1925, I went to him because I knew that he was representing Mrs. Belo. I did know that he was representing Mrs. Belo as a result of previous negotiations I had with him and Williams. * * *

"As to whether it is a fact that after I found out through Mr. Williams that she would lease it for a funeral home, that I

never did give up the idea or desire of obtaining the property, I don't remember about my desires; I can't tell you about that."

With reference to the first deal, Mrs. Belo testified that prior to Williams' demand for a fee of $5,000 she and Mr. Sparkman had reached an agreement on almost all other matters, and she had packed and stored her furniture in an endeavor to close the deal, at great expense and inconvenience to herself, and she waited in Dallas until the last minute hoping that the lease would be closed, but, having already engaged passage to Europe, she had to leave, and left instructions that Mr. Williams be notified that she would have no further dealings with Mr. Sparkman. She further testified that she did not come to Dallas to close said lease deal, but to discuss it, and did not then know the amount of fee to be paid, nor how it would be paid. She testified that her attorney had wired her he would recommend a fee to Williams of $2,500, but that he was asking $5,000, and assumed that he would take the lesser sum or else take his larger demand in monthly payments out of the rent as collected. "When I came to Dallas and found that Williams demanded $5,000.00 to be all guaranteed by me, I was compelled in turn to require a similar guarantee from the tenant and that broke up the deal."

She went to Europe in June, 1924, and returned to Dallas in November, 1925, when she did lease the property to Sparkman. The lease was for the same property, the rental per month was the same, but she testified in almost every respect the lease was different in term, method of payment, and the rights of landlord and tenant.

We think the evidence (of which the above excerpts are a part) was sufficient to take the case to the jury and to support the jury's findings.

It is the province of the jury to determine questions of fact, but it is in the power of the trial judge to set aside the findings and award a new trial. The Court of Civil Appeals has the same power upon appeal, but it cannot set aside the jury's verdict, substitute its own findings for those of the jury, and render judgment accordingly. Choate v. Ry. Co., 91 Tex. 406, 44 S. W. 69; Brown v. City Service Co. (Tex. Com. App.) 245 S. W. 656.

As said by Judge Brown, in Houston & T. C. Ry. Co. v. Strycharski, 92 Tex. 1, 37 S. W. 415, 417:

"In the exercise of its appellate jurisdiction, a court of civil appeals may draw from the evidence conclusions of fact different from those arrived at by the jury or judge, and it may reverse the judgment of the lower court, and remand the cause, for the reason that the verdict and judgment are against the weight of the evidence. But the determination of questions of fact as the basis of a final judgment involves the exercise of original jurisdiction which has not been conferred upon the courts of civil appeals."

Whether there is any legal evidence as a basis for the jury's verdict presents a question of law which the Supreme Court may pass upon. Beck v. Texas Co., 105 Tex. 303, 148 S. W. 295; Lancaster v. Carter (Tex. Com. App.) 255 S. W. 392; Lee v. Ry. Co., 89 Tex. 583, 36 S. W. 63.

But where the Court of Civil Appeals concludes that the jury's finding is clearly against the great weight of the evidence, this involves a finding of fact binding on the Supreme Court. Wilson v. Freeman, 108 Tex. 121, 185 S. W. 993, Ann. Cas. 1918D, 1203; Sprinkles v. Kerbow (Tex. Com. App.) 279 S. W. 805; Priddy v. Childers (Tex. Com. App.) 240 S. W. 1107; 3 Tex. Jur., p. 1192. In such a case, the Court of Civil Appeals can only remand; it can render only where the evidence is so conclusive that there is no issue for a jury, that is, if the trial court should have instructed a verdict. Eastham et al. v. Hunter et al., 98 Tex. 560, 86 S. W. 323.

The conclusions of law of the Court of Civil Appeals and upon which they predicated their judgment of rendition were precluded by the findings of fact by the jury from all the testimony. The conclusion of law that only a restricted or limited listing was made is in conflict with the findings of the jury that defendant in error employed plaintiffs in error to lease the property in question and agreed to pay them a commission therefor. The conclusion of law that defendant in error did not know of plaintiffs in error's efforts after July 23, 1924, is in conflict with the findings of the jury that she not only knew but authorized their negotiations with Sparkman. The conclusion of law that Sparkman voluntarily resumed negotiations without solicitation of defendant in error or any one acting for her is in conflict with the findings of the jury that plaintiffs in error were the procuring cause of the lease that was consummated.

Having reached the conclusion that the Court of Civil Appeals erred in its disposition of the case, we must now decide whether the cause should be remanded to the district court for another trial, or judgment should be here rendered affirming the judgment of the district court.

As said by Associate Justice Greenwood in Marshburn v. Stewart, 113 Tex. 507, 254 S. W. 942, 260 S. W. 565, 566:

"There is a difference in the authority of the Supreme Court in causes wherein the Court of Civil Appeals enters a final judgment by affirming that of the trial court or by rendering a different judgment, and in causes wherein the judgment of the trial court is reversed and the case remanded for a new trial.

The distinction was stated with clearness and precision in Tweed v. Western Union Telegraph Co., 107 Tex. 255, 166 S. W. 696, 177 S. W. 957, as follows: 'With the court of Civil Appeals invested with the full power of determining the facts of the cause, and setting aside the verdict of a jury on the facts, it must be assumed, * * * that in reaching a conclusion that the evidence showed as a matter of law that the plaintiff was not entitled to recover, and for that reason ordering that the cause be remanded, in the same case it would have held that the verdict was against the weight of the evidence. With a case thus remanded under the judgment of the Court of Civil Appeals, it would amount to a denial of its authority to determine the facts and set aside a verdict on the evidence for this court to assume the power of rendering the judgment because it differed with the conclusion reached by that court upon the effect of the evidence.

" 'Beck v. Texas Company, 105 Tex. 303, 148 S. W. 295, furnishes no analogy. The distinction between that case and this one is manifest. There the court did not exercise the authority it possessed to set aside the verdict on the facts and remand the cause. It rendered judgment in favor of the defendant on the facts; and in doing so made no finding of fact which would defeat recovery. In differing with the Court of Civil Appeals upon the question of law as to the effect of the evidence, we were authorized to affirm the judgment of the lower court, since the Court of Civil Appeals had not sought to exercise its province of determining the facts and ordering the case remanded for another trial because of its difference with the jury on the facts, and in affirming the judgment we therefore in no wise trenched upon its authority. Had the Court of Civil Appeals there remanded the case instead of rendering judgment, we would have been compelled to respect its judgment to that extent and could not have affirmed the trial court judgment.' "

Here the Court of Civil Appeals did not remand, but rendered judgment for the defendants on the facts; in differing with that court upon the question of law as to the effect of the evidence, we are therefore authorized to affirm the judgment of the lower court without trenching upon the authority of the Court of Civil Appeals, and accordingly recommend that the judgment of the Court of Civil Appeals be reversed, and that of the district court be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.