Mitchell Metzler, Minor, by Mary Mielcarek, His Mother and Next Friend, Appellee, v. Lewis Layton and La Salle Finance Corporation, Appellants.

Gen. No. 40,240.

530

Opinion filed February 1, 1939.

JOHN A. BLOOMINGSTON, of Chicago, for appellants.

ROYAL W. IRWIN, of Chicago, for appellee.

MR. JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

Defendants bring this appeal from a judgment for $18,000 entered in favor of plaintiff and against defendants in the circuit court upon the verdict of a jury in a suit in trespass on the case. The suit was one for damages because of personal injuries alleged to have been received by plaintiff. There was a special finding of wilful and wanton conduct against the defendant Lewis Layton.

It is charged in the amended complaint that on February 2, 1935, the La Salle Finance Corporation had offices at 160 North La Salle Street, Chicago, and that it had in its employ one Lewis Layton who, as its servant and agent, engaged in the management, control and protection of the business; that on the aforesaid date the defendant Lewis Layton, as the servant for and on behalf of the La Salle Finance Corporation,

with force and arms wilfully, wantonly and wrongfully assaulted the plaintiff and then and there wilfully, wantonly and wrongfully shot and discharged a loaded revolver at and against the plaintiff, thereby causing the plaintiff to be struck with bullets discharged from said revolver. That all of the acts were done by the defendant without reasonable cause or provocation, to the damage of the plaintiff and against the peace of the People of the State of Illinois, etc.

The theory of the plaintiff is that the defendant, Lewis Layton, was an employee of the La Salle Finance Corporation; that there was a robbery in the office and after the robbery the defendant Layton ran out into the hall and looked about for the robbers; that at the west end of the hall he then saw a man running toward him from the east and he shot him; that the act of the defendant Layton was in the course of his employment and that it was so reckless as to amount to wilful and wanton conduct.

Defendants' theory as to the defendant La Salle Finance Corporation is that the defendant Lewis Layton acted outside the scope of his authority and that they are not bound by the acts of Layton outside the scope of his authority.

The defendant Lewis Layton depends upon the theory that he was acting under stress of a man who had just been held up at the point of a gun and was seeking to apprehend and punish the bandit, and that he acted without malice and in good faith in what he did.

Plaintiff Mitchell Metzler contends that at the time of the occurrence, he was a boy about 17 years of age and tall for his age; that he was employed by Mr. Adelman, an attorney, as office and messenger boy; that he had been directed by Mr. Adelman to call at the office of the La Salle Finance Company at 160 North La Salle street to pick up some papers; that on the morning of February 2, 1935, plaintiff went to the office of the

La Salle Finance Company where he found a robbery being committed; that there were three robbers in the place, all armed, and the defendant Layton was standing with his face to the wall.

Plaintiff further contends that when the plaintiff Metzler entered the offices he was immediately "covered" by one of the robbers and he was also compelled to stand with his face up against a wall while the robbers ransacked the desks, cabinets and safes in search of booty.

Plaintiff further contends that when the robbers had finished, both the plaintiff and Layton were forced into a clothes cabinet; that as soon as they heard the robbers leaving, Layton and Metzler forced the cabinet away from the wall and Layton jumped out and ran down the public hallway with a revolver which he had on his person in pursuit of the bandits, that immediately following was the plaintiff Metzler who shouted as he ran, "Help police," "Help robbers"; that when the plaintiff approached Layton to within a few feet, Layton turned quickly and shot plaintiff in the abdomen; that for some unaccountable reason Layton stepped into an office near where the tragedy occurred, opened the door and fired another shot directly at Metzler's head.

Plaintiff further contends that Metzler had been calling at the office of the La Salle Finance Corporation on an average of 7 or 8 times a week for several months; that Layton knew Metzler well and had transacted considerable business with him.

Metzler sued Layton on the theory that he was guilty of reckless disregard of the rights of others, and such a conscious indifference to the consequences of his acts as would amount to an intent to injure.

Suit was brought against the La Salle Finance Corporation on the doctrine of *respondeat superior*. Layton was the manager of the defendant, La Salle Finance

Corporation, and was in complete possession and control of the offices and its property.

Our Supreme Court has had no occasion to pass upon a case where the circumstances were similar to the instant case, according to the published cases, so it appears that the decision in this case must be based upon the reasoning and logic set forth in opinions published in other jurisdictions in similar cases.

In the instant case the conceded facts are that the La Salle Finance Corporation made Layton the general manager and placed him in possession and control of its office and property with general instructions. Under those circumstances and while carrying out the general instructions and the implied duties cast upon him, the plaintiff Metzler was injured. The acts of the defendant Layton while in possession and control of the property of the La Salle Finance Corporation and in endeavoring to protect his employer's property, plaintiff contends were all within the general scope of his employment. On the contrary, and this seems to be the point of difference, it is contended by defendant that he was acting as a citizen in pursuance of a social duty to help capture criminals and prevent a crime.

The evidence shows that Layton was in charge of the office; that his authority was general and he was the La Salle Finance Corporation's representative, so far as the business transacted was concerned; that the office consisted of two rooms and Layton had one room in which there was a desk, swivel chair, three other chairs and a davenport; that the other room was occupied by his secretary and contained a desk, stenographer's chair, three other chairs, a file cabinet, a safe, and an adding machine; that there were no persons in these two offices but Layton and his secretary.

The evidence further shows that Layton had a safe in the office in which he kept their records, ledgers, cash journal, applications and such, and that they had

checks; that the safe had a combination known to Miss Jacobs and Layton and that they kept things in the safe to prevent their being stolen and lost in case of fire; that the petty cash was kept in an envelope in the filing cabinet which was locked at night; that either Layton or Miss Jacobs locked it, and that she worked under his supervision.

The evidence further shows as testified to by Layton that interest on loans was sometimes paid into the office in currency; that before it was deposited in the bank it was kept in the safe; that bills were sometimes paid in currency and for that purpose a certain amount of petty cash was kept on hand; that most of the money came in by way of checks which were placed in a tin box and kept in the safe; that mortgages, notes, trust deeds and other papers were kept in the safe until they were transferred to the vault to prevent their being stolen and that the combination to the safe was known to Miss Jacobs and Layton; that there was no watchman, just Miss Jacobs and Mr. Layton.

The evidence further shows that Layton while testifying made the following statements:

"I locked the doors of the office, I did that to prevent people from coming in and taking away the property. Mine and the girl's also. I didn't leave it open so some person could come in and steal, to that extent I protected it. . . . When they were going through the safe and cabinet, they were going through the property of the La Salle Company."

The evidence further shows, as testified to by Layton that his secretary had called his attention to the fact that some suspicious men had been around the place. Layton stated:

"When she told me that, my suspicions were aroused and I thought I might as well be safe. The very next day I brought this 25 caliber Colt. I kept it on my person in the office from that day on. . . . I had it about

ten days before February 2, 1935. In the office, I had it in my lower left pocket every minute. When I left I kept it in the closet, in a coat.''

The signed statement which Layton gave to the police, reads: ''No, I had it in the office drawer all the time.''

We think the evidence shows that the defendant La Salle Finance Corporation, on February 2, 1935, had an office where it carried on its loan business under the personal supervision and direction of Layton, its agent and manager. He was the only one in charge of the office and its fixtures. Said Finance Corporation had in this office its furniture, securities, and sometimes currency. Layton had nothing in the office except his personal effects. The office was always under his control and in his absence under the control of his secretary. The office was closed at night and the door locked, so as to prevent any stealing of property belonging to the La Salle Finance Corporation. A safe was also kept in the office, in which the valuable papers of the La Salle Finance Corporation were placed.

As before stated it is a rule that the master is liable only for the acts of a servant which are done within the scope of his employment, and that question is one for the jury to decide.

As to just what is the relationship between an employer and an employee, when said employee ceases to be a representative of his employer or in such capacity as binds the employer, is the deciding point in many cases. It has been held that it is the implied duty of an employee that he protect the property of his employer.

In the case of *Baum v. Industrial Commission,* 288 Ill. 516, was a compensation case. The employer was engaged in manufacturing wash garments. The deceased was an assistant and cutter. The employer's shop was not unionized, but a general strike was called

among garment workers. At the time of the assault, strikers rushed into the shop where the deceased and other employees were engaged in work. The employer and the deceased attempted to hold the strikers back. The Supreme Court discusses the duties of an employee in the defense of his employer's property and other employees. The court said: "Nothing was said between the plaintiff in error and Tomczyk. Tomczyk, seeing his employer and his fellow-employees in apparent danger, came to the rescue. He was assisting his employer in the defense of his person and his property and was acting in defense of his fellow-employees, all of whom were women. We have held that it is the duty of an employee to do what he can to save the lives of his fellow-employees when all are at the time working in the line of their employment. (*Dragovich v. Iroquois Iron Co.*, 269 Ill. 478.) That the fellow-employees of deceased were not actually in danger of losing their lives cannot change the rule. The danger was clearly apparent to Tomczyk. He acted as any man would have acted under the circumstances. The rioters had rushed in without warning and threw the women employees into a panic. It was up to deceased to act or to abandon the workroom and its occupants to trespassing strangers, apparently bent upon doing damage to whatever came in their path. The situation was an unusual and unforeseen one and called for quick action. From every point of view it was the duty of deceased to defend himself and his employer and to assist his employer in defending the persons of his women co-workers. Where the trouble arises out of the employer's work, and as a result of it one of the trespassers injures an employee who is defending his employer's business, it may be inferred the injury arose out of the employment."

In the case of *Central Motor Co. v. Gallo* (Tex. Civ. App.), 94 S. W. (2d) 821, the defendant was engaged

in the repair of automobiles. The plaintiff had his car repaired and later returned to the shop claiming that the work was unsatisfactory. An argument arose between the plaintiff and the defendant's servant over the character of work that had been done, and as a result, the employee struck the plaintiff severely injuring him. The court said: " 'The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority and inflicts unjustifiable injury on a third person.' 39 C. J. p. 1285, § 1476.''

In *Bearman v. Southern Bell Telephone & Telegraph Co.,* 17 La. App. 89, 134 So. 787 (1931), it appears that a child 9 years old was playing in front of the defendant's garage, where it repaired automobiles used in its business. A mechanic employed by the defendant was the only employee on duty at the station, and was engaged in the repair of a tire on one of the company's trucks. The plaintiff and other boys came into the garage and interferred with and annoyed the employee, and on failing to leave, the plaintiff's child was whipped by the employee. The court said: ''There was no other representative of the company on duty at the place at the time of the alleged beating. It would appear to us that it was the duty of the mechanic or man in charge —call him what you may—to protect the company's property and to keep out trespassers, and we feel that if he had stood by and permitted the boys to waste the gasoline and had not attempted to stop them and put them out, his employer would have discharged him. This is to be implied from the position he occupied. From the record it appears that the boy had never had

any previous personal encounters with the defendant's employee and that there was no ill feeling between them.

"We have come to the conclusion that the employee was acting within the scope of his employment, or 'in the exercise of the functions in which he was employed' (article 2320 R. C. C.), in stopping the boys from wasting the gasoline and ejecting them from the premises. The fact that he acted unwisely or went too far in so doing does not take the act out of the scope of the employment. Even illegal methods adopted by an employee will not excuse his employer when the acts are done in the scope of his employment."

In the case of *Chisholm v. Berg* (Mo. App.), 78 S. W. (2d) 486, it appears that the plaintiff was walking on the sidewalk directly in front of a store operated by the defendants intending to enter therein to make some purchases. When she was a few feet from the entrance two boys rushed swiftly past her, followed instantly by the defendants' general manager in charge of the store who ran into her as he was running and injured her. The court in that case, said:

"There can be no doubt that the act of Joseph Berg in running into and knocking plaintiff down on the sidewalk in front of the store was such as to warrant the court in submitting to the jury the question of whether or not he (Berg) was negligent in so doing, and, when we come to inquire into the circumstances out of which that act arose, to determine whether or not it was within the scope of his duties, we find that it conclusively appears that the fight between Joseph Berg and the sons of Mrs. Woods came about through the attempt of Joseph Berg to adjust Mrs. Woods' complaint about being short-changed. In attempting to adjust that claim, Mr. Berg was unquestionably engaged in the business of Berg's Market, Inc. It was clearly a busi-

ness transaction of the store, and not a personal transaction of his own, which Berg was called upon as manager of the store to adjust. The corporate defendant had placed him in charge of its store for just such a purpose. It was while he was engaged in that very transaction that the fight started. The transaction had not been completed. . . .

"If the fight between Mr. Berg and Mrs. Woods' sons had arisen out of a dispute between them as to a claim against Mr. Berg personally, or because of some other matter personal to him, the fact that he was president and general manager and was in charge of Berg's Market, Inc., and the further fact that the fight took place in the store or on the premises would not have been sufficient to have rendered that defendant liable, for the reason that, notwithstanding those facts, Berg would not have been engaged in any business of his master at the time plaintiff was injured, but we have no such state of facts in this case."

In the case of *Gulf, C. & S. F. Ry. Co. v. Cobb* (Tex. Civ. App.), 45 S. W. (2d) 323, a railroad switchman shot a circus trainmaster interfering with the switchman's duties. Certainly, it cannot be said that a switchman is ordinarily authorized to carry a revolver in the performance of his duties. The court in that case said:

"When the master places his property in the possession of his servant, 'the right to protect that possession, as well as the right to prevent any interference with its immediate use, springs out of the possession and the duty to control and manage it,' and, for any assault made by the servant upon a third person immediately growing out of the exercise of his right to control and manage the property by which the servant uses more force than is necessary, the master is liable for the injuries so inflicted."

So, it seems to us, that when the defendant the La Salle Finance Corporation placed Layton in charge of its office under general instructions as to the performance of his duties, it must have been impliedly understood by both parties that Layton was to take care and protect the property of the defendant company which had been placed in his charge. Manifestly, he was not engaged in his private affairs while being paid as manager of the defendant company. The evidence shows that the actions herein referred to occurred very rapidly and were very close together, when Layton was endeavoring to protect the property of his employer.

As was said in *Eldridge v. Black Canyon Irr. District,* 55 Idaho 443, 43 P. (2d) 1052, 1054: "The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business, or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another."

The La Salle Finance Corporation made the selection of the man whom they desired to represent them. They had a chance to judge and pass upon his qualifications as their representative, and the duties to be imposed upon him. They must have known his temperament, his mentality and his capacity to act under stress or unusual circumstances and, having selected him for the position, we do not think the mere fact that the shooting occurred outside the office, excuses them from responsibility and the application of the doctrine of *respondeat superior.*

Plaintiff was shot twice by Layton. After the first shot he fell to the floor. Then the defendant dodged

into an office and while the plaintiff was lying helpless on the floor the defendant Layton approached him closely again and shot him. The entire transaction occurred in a very few minutes.

The rule seems to be that it is not the cause which made the employee do what he did and responsibility is not limited to those acts which promote the objects of the employment. In the 18 Ruling Case Law, p. 797, it is said: ''Expressions equivalent to 'scope of employment' are line of duty, in the employer's service, course of the service, transaction of the employer's business, furtherance of the employer's interests, protection of employer's property, and the like. The general idea is that the employee at the time of doing the wrongful act, in order to fix liability on the employer, must have been acting in behalf of the latter and not on his own account.' ''

In *Chicago R. I. & G. Ry. Co. v. Carter* (Tex. Com. App.), 261 S. W. 135, the defendant employed a crossing flagman who killed a teamster in an altercation arising from the teamster's attempt to cross the tracks in front of a train. The flagman went to his shanty, got his gun and shot the teamster and it was held that his act was a continuance of his duties, and that the killing was an unbroken continuation of the controversy. The court in that case said: ''The whole time of the difficulty was very short, and it would be extremely difficult for us to determine just when the flagman ceased to act within the scope of his employment and began to act as his own master, if he was so acting at the time of the shooting, and under the peculiar facts of this case we do not think that the law can undertake to say just when the flagman ceased to act as agent, or that he did so cease, but that the finding of the jury on that matter should govern.''

In *Young v. Sinclair Refining Co.* (Mo. App.), 92 S. W. (2d) 995, it was held that a person employed to

complete cement work on a filling station under construction for a refining company was acting within · the scope of employment so as to impose liability upon the refining company and building contractor for injuries to a child struck by a hammer thrown by the employee to prevent the child from trespassing upon cement work. The court in that case, said: ''At the time he threw the hammer, he was actually engaged in prosecuting the cement work which he was expressly employed to do under the terms of his contract; that he threw the hammer to prevent the respondent from trespassing upon such work and injuring it. This was done in the course of his employment and in furtherance of the interest of his employers and for the protection of their interests and business, which had for the time being been intrusted to him. That such act may have been unnecessary or not specifically required of him, or even may have been contrary to the express directions of his employers or actuated by malice or some other improper motive, is, under the rule, immaterial. Such act was, nevertheless, done in the course of his employment while in the performance of his duties in furtherance of the business and interests of his employers.''

In *Interstate Co. v. McDaniel,* 178 Miss. 276, 173 So. 165, an employer of a vendor of newspapers and refreshments on a train was held liable for injuries inflicted by such vendor on a drunken passenger whom the vendor struck after having accused the passenger of stealing oranges. The court said: ''Where the injurious act complained of is not so separated by time and logical sequence from the business of the master as to make it a separate and independent transaction, the master is not relieved of liability. Where the whole transaction, as here, consumes only a few moments and has all the features constituting one continuous and unbroken occurrence, a master is not re-

lieved of liability because the servant stepped outside of his authority.''

Complaint is made of the action of the court in giving an instruction to the jury finding the defendants not guilty at the close of all the evidence and the next morning withdrawing the instruction and submitting the case to the jury. We do not see how the defendants could have been prejudiced by this action. The trial judge, upon reflection, had decided he was wrong and it was entirely proper for him to change his mind before the jury had retired. We think it would have been erroneous for the court to have permitted the instruction to remain with the jury. In answer to the interrogatory submitted as to the defendant Layton, we do not think the evidence supports the special finding.

Complaint is further made that the plaintiff should have been required to prove his case beyond a reasonable doubt, because defendants contend the complaint charges a felony under the statute, and for that reason the rule applicable in criminal cases should prevail. We do not so understand the complaint, but even if it were so construed, it could at best but charge a misdemeanor. As the Supreme Court said in the case of *Rost v. Noble & Co.,* 316 Ill. 357, 372: ''The reason in which the rule seems to have had its origin is applicable only to cases where the charge was of a felony, and in general it is in such cases, only, that the rule has been applied. It will not be extended further but is limited to charges of felony. The offenses for which penalties are imposed by the statute are not crimes of a character the charge of which in a civil suit is required to be proved beyond a reasonable doubt, and the instruction properly so advised the jury.'' *Gannon v. Kiel,* 252 Ill. App. 550, 559; *Cooper v. Nutt,* 254 Ill. App. 445, 460; *Wargo v. Buske,* 273 Ill. App. 28, 32.

Complaint is further made that the court erred in giving certain instructions and refusing others. Without extending this opinion to too great length, we may say that we have read the instructions both given and refused and we do not think the defendant was prejudiced by the action of the court in that respect.

Finally defendants claim that the amount of the verdict for $18,000 was excessive. At the time of the accident the plaintiff was a young man 6 feet tall and in perfect health. One bullet perforated the rectum in two places, passed through the posterior bladder, as well as the prostate. An incision was made in the left side of the abdomen, bringing out the larger portion of the intestines above the injury to divert the fecal stream. It was necessary to open up the bladder at the midline, to sew up the holes on the other side. The bullet was found in the buttocks, and afterwards removed. The large intestine was opened up in the side so that the contents of the bowel came through the opening, instead of the rectum, which condition still exists. A transfusion of blood was necessary to save the boy's life. Plaintiff was also shot in the arm, which resulted in disturbance of the ulnar nerve which ran to the fifth finger. Plaintiff remained in the hospital for 4 months. The wound is still open and plaintiff has been unable to do any work since. Under the evidence, we do not believe the amount of the verdict was excessive.

Complaint is made on behalf of Layton as to the special finding of the jury in answer to the following interrogatory:

"Was the conduct of the defendant Lewis Layton as shown by the preponderance of the evidence, of such a reckless character as to show an utter disregard for the safety and lives of others? The jury's answer was 'Yes.'" From a careful review of the evidence we do not think the jury was justified in so finding.

Having considered all the facts as presented, as well as the law applicable thereto, we think the jury was justified in arriving at the general verdict against both defendants which they did and the trial court was right in entering judgment on that verdict.

For the reasons herein given the judgment of the circuit court is affirmed.

*Judgment affirmed.*

HALL, P. J., and HEBEL, J., concur.